**ROUSE et al. v. BURNHAM.**
No. 342.

Circuit Court of Appeals, Tenth Circuit.
Aug. 6, 1931.

John S. Dean, of Topeka, Kan. (John S. Dean, Jr., Frazor T. Edmondson, and George W. Ball, all of Topeka, Kan., on the brief), for appellants.

Tinkham Veale, of Topeka, Kan., and Chas. L. Kagey, of Beloit, Kan. (Lloyd M. Kagey, of Beloit, Kan., on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Appellee sued appellants in the state district court of Kansas for malicious prosecution. That case went to trial. After all the evidence was introduced, plaintiff took a non-

710

suit and six months later instituted this suit on the same cause of action and recovered. The defendants then brought this appeal.

The action is bottomed on four complaints verified by appellant Mangus, wherein Burnham was charged with embezzlements of moneys of the Western Producers Oil and Gas, Inc., a corporation. Four complaints were filed with the Justice of the Peace of Goodland, Kansas, who issued warrants of arrest on which the sheriff arrested Burnham and put him in the county jail, where he remained for three hours and thirty-five minutes, when he gave bond for his appearance and was released. On two of the charges, Burnham had preliminary hearing and was let to bail for appearance in the district court. When these two charges came on for trial in the district court the county attorney dismissed them without trial, and he also dismissed the other two charges still pending in the justice of the peace court. Each of the four criminal charges is the basis of a separate cause of action, and the jury returned a verdict for the plaintiff on each count.

The criminal charges against Burnham came about in this way: The corporation, named above, needed about $10,000.00 to complete the drilling of a well for oil in the vicinity of Goodland; the three appellants and H. N. Slater, president of the corporation, owned about 75,000 shares in the corporation, and they entered into a written contract with Burnham in January, 1926, by which he was appointed sales agent of the corporation's treasury stock. He agreed to sell the stock to the amount thought to be needed to complete the well, and the other parties to the contract agreed to give Burnham, for his services, 12,500 shares out of their 75,000, and also to assign to him an oil lease on 160 acres. Burnham did not carry out his obligations of the contract.

There were four sales of shares of stock on which the four criminal charges were based,—one to Jane Van Donge on March 2, 1926, of 50 shares for $50.00, one to Lloyd G. De Lay on March 2, 1926, of 100 shares for $100.00, one to D. A. Laughlin on March 2, 1926, of 100 shares for $100.00, and one to Jane Van Donge on March 4, 1926, of 50 shares for $50.00. When each of the above sales was made Burnham gave the purchaser the corporation's receipt for the named purchase price of the shares, his name appearing thereon as salesman, except he testified that he did not make the sale of the 50 shares to Jane Van Donge on March 2d, that his wife

made that sale; nevertheless, the receipt to Jane Van Donge for $50.00 given in the name of the company for those 50 shares has Burnham's name thereon as salesman, and is just like the receipts given when the other three sales were made. A day or so after the sales made on March 2d, new certificates were issued by the corporation, one to De Lay for 100 shares, one to Laughlin for 100 shares, and one to Jane Van Donge for 50 shares, and the corporation's records show that those reissues came out of shares privately owned by one Bane, and, of course, were not treasury stock. What has been said about sales to the parties named and other evidence relating to that subject, hereinafter to be noted, will answer the inquiry whether the plaintiff sustained the burden of showing that he was arrested and prosecuted without probable cause to believe him guilty. This, of course, is the main issue in an action of this kind. There must be malice also, but malice may be inferred from lack of probable cause, and lack of probable cause cannot be inferred from malice. There may be malice—even express—but, if there be probable cause for the arrest and prosecution, an action of this kind must fail. Stewart v. Sonneborn, 98 U. S. 187, 25 L. Ed. 116; Wheeler v. Nesbitt, 24 How. 544, 16 L. Ed. 765; Crescent City Live Stock Co. v. Butchers' Union, 120 U. S. 141, 7 S. Ct. 472, 30 L. Ed. 614; Director General v. Kastenbaum, 263 U. S. 25, 44 S. Ct. 52, 68 L. Ed. 146; Walton Trust Co. v. Taylor (C. C. A.) 2 F.(2d) 342, 345; Daniel v. Pappas (C. C. A.) 16 F.(2d) 880; Blakely v. Greene (C. C. A.) 24 F.(2d) 676; Chapman v. Anderson, 55 App. D. C. 165, 3 F.(2d) 336.

We now point out the additional evidence bearing on the question of probable cause. Burnham testified in this case that the stock sold to the three named persons, barring one of the sales to Jane Van Donge, was Bane's stock; that he was helping Bane at the request of Dawson to make those sales; that Bane got the money on each sale; that he, Burnham, gave the corporation's receipt to each purchaser because he had no other paper with him; and that soon thereafter he and Bane went to the corporation's office and told appellant Mangus and Mr. Heston (the latter being postmaster at Goodland and secretary of the corporation) about the transactions, and that he left with them carbon copies of the receipts he had given. Bane did not testify, nor were Jane Van Donge, De Lay, or Laughlin called as witnesses. Mangus and Heston testified, and each denied that the transactions were reported to them as tes-

tified to by Burnham or that copies of the receipts were brought to them or left with them by him. On cross examination, Burnham admitted that on the trial of the civil case in the state court he testified that he was alone in the transaction with De Lay and that he traded 100 shares of his own stock to De Lay for a seed drill, a plow, and a harrow, and thereupon he gave to De Lay the corporation's receipt for $100.00; that he had purchased the shares he traded to De Lay with his own money. It was also shown that Burnham testified in the case in the state court that the 100 shares sold to Laughlin were Burnham's stock, and that those shares were to be taken out of shares Slater had given him or out of 300 shares he had bought with his own money; that those shares were issued to him by Heston and Mangus, and he had paid the money to Heston. This testimony of Burnham in the state court is in direct conflict with his testimony here wherein he says he was helping Bane sell his (Bane's) stock; that Bane got the moneys named in the receipts. That conflicting testimony, however, does not go to the issue of probable cause. It was given after the arrests were made, but it does bear heavily on the credibility and weight to be given to Burnham's evidence in the court below when we come to consider the defendants' challenge to the plaintiff's case when all of the evidence was in.

But there is additional evidence on the issue of probable cause. Appellant Mangus, who verified the criminal charges, testified that on March 3, 1926, Ira Bane brought his stock certificate into the oil company's office and asked him to transfer some of said stock to De Lay, Laughlin, and Jane Van Donge; that he made such transfers himself; Burnham was not present; he did not know that Burnham had anything to do with the sale of Bane's stock, and never did know that he claimed to have anything to do with said sales until the time of Burnham's preliminary trial; Burnham never came into the oil company's office and showed him any receipts concerning sales of Bane's stock, nor did he at any time say anything about such receipts; sometime in the fore part of April, 1926, Mrs. Van Donge came into the office and stated that she had bought some stock in the oil company; Mangus learned from her that she had bought from Burnham, and upon his request she brought in the two receipts which Burnham had given her at the time she bought; Mr. Laughlin also brought his receipt to the office; the first time he saw Mr. De Lay's receipt was when he and the county attorney called at Mr. De Lay's home; after obtaining these receipts, he went to see Mr. Slater, Mr. Dawson, and Dr. Rouse, and some of the other directors, showed them the receipts, and asked their advice. Their advice to him was to take the receipts to the county attorney, and see what he had to say about the matter. Whereupon, he went to see the county attorney, drove the county attorney out to Jane Van Donge's home, also to Mr. Laughlin's home, and to the home of Lloyd G. De Lay. Mr. De Lay and Mrs. Van Donge were at home and were talked to by the county attorney. Mr. Laughlin was not at home. Mr. Stewart was the county attorney, and his advice to Mangus was to go to Burnham and request that the money obtained through the sale of stock, as evidenced by the receipts, be turned over to the company. Whereupon, he went to see Burnham, told him about the receipts, and demanded the money. Burnham offered no excuse for the receipts, but merely stated that he did not owe the company a dime. After Burnham's refusal, he went back to Mr. Stewart and told him that he had been unsuccessful in attempting to obtain the money. Whereupon, Mr. Stewart stated that he would draw up some complaints, and he (Mangus) could come back later and sign them. Mr. Stewart stated that he thought Burnham had committed a crime. Later he returned to the county attorney's office and signed the complaints. That part of the evidence of Mangus, fully summarized above, relating to the issue of probable cause, is the interview that Mangus had with Burnham at the direction of the county attorney. Mangus testified that he went to Burnham, told him about the receipts and demanded the money, and that Burnham offered no excuse for the receipts, but merely stated that he did not owe the company a dime. There is no contradiction of this testimony of Mangus, by Burnham or any other witness. It shocks common sense to ask one to believe that Burnham would have contented himself with the reply he made to the demand of Mangus, if he had theretofore furnished Mangus and Heston with copies of those receipts and informed them that the receipts represented sales of Bane's stock. Had he or Bane done that, it is incredible that he would have failed to call Mangus' attention to the fact. Burnham had admitted in writing over his signature that he sold the company's stock and had received as its sales agent the purchase price. That is not rendered untrue by the fact that stock was later issued to the purchasers that had belonged to Bane or Burnham. It is just as reasonable

to infer that the sales were made as represented by Burnham's receipts, and that it was thereafter concluded to keep the company's money and substitute the stock of Bane or Burnham for the company's stock. In the cases cited, supra, it will be found that the rule of law is stated thus:

"The question of probable cause is a mixed question of law and fact. Whether the circumstances alleged to show it probable or true, and existed, is a matter of fact; but whether, supposing them to be true, they amount to probable cause, is a question of law."

But there is another rule equally well settled and not in conflict with this rule, which is this:

"It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but is of so conclusive a character that the court, in the exercise of a sound judicial discretion, would set aside a verdict in opposition to it." Walton Trust Co. v. Taylor, supra.

We cannot doubt that, if all of the evidence in this case relating to the question of probable cause is fairly considered, the case is brought within the second class, and that the court erred in denying appellants' request for an instructed verdict in their favor.

There is another and separate reason why the motion for instructed verdict should have been granted in favor of Rouse and Dawson. It is alleged in each count that Rouse and Dawson counseled, assisted, and conspired with Mangus in instituting prosecution of the criminal charges. We find no evidence in the record that tends to sustain that allegation. We have already noted that Mangus testified that when he obtained the receipts he went to Slater, Dawson, Rouse, and some of the other directors, showed them the receipts and asked their advice, and they advised him to take the receipts to the county attorney and see what he had to say about the matter. Rouse and Dawson confirm this. They each testified that the only talk they had with Mangus about the issuance of these receipts was to advise him to go and consult the county attorney. There is no testimony that either of them did anything else about the matter. Rouse further testified that the county attorney did not talk to him before Burnham's arrest, and Dawson testified that he did not conspire or agree with anyone to have Burnham arrested. We are not unmindful of the testimony as to what occurred at a meeting on the evening of March 23, 1926. That meeting was called because Burnham had undertaken to discharge, or at least it was reported that he had undertaken to discharge, the driller at the well, and he was notified to attend that meeting. We gather from the record that Burnham had the notion that the written contract by which he was employed to sell treasury stock also gave him the management of the company's operations. The contract did not give him such authority. Others who attended that meeting were Rouse, Mangus, Heston, Hamilton, Slater, Gregory, Frakes, Gilbert, and Forney. Burnham's wife, his sister, and a seventeen year old boy who lived with the Burnhams, testified that they stood at a window of the room in which the meeting was being held, and heard Dawson say they had to get rid of the Indian, and that Rouse replied they had to get rid of him behind the bars and throw the key away. They testified this occurred while Burnham was out of the room in which the meeting was being held. This was denied by Gregory, Heston, and Rouse. Furthermore, Dawson testified that he was not at the meeting; that he had left the day before with a shipment of cattle to Kansas City and did not return for several days, and he said he had with him while testifying the bill of lading issued at Goodland on March 22d. Gregory, who is a minister at Goodland and presided over this meeting, Hamilton, Heston, and Mangus corroborated Dawson's testimony that he was not at the meeting. This testimony about "getting rid of the Indian" was probably offered to show ill will or malice and conspiracy, but the greater weight is with the defendants that no such statements were made by anyone and that Dawson was not there. It had no bearing on the subject of probable cause. Much of the testimony as to what occurred at that meeting had no relevancy to the issues in this case and should have been excluded as prejudicial and incompetent.

In each count the plaintiff asked for $3,000.00 actual damages and $5,000.00 as punitive damages. The court in its instructions directed the jury to state the damages, actual and punitive, separately in its verdicts in the event it found for plaintiff. This direction was not complied with. The jury returned verdicts in favor of the plaintiff on each count for $6,000.00. The defendants moved for a new trial, one of the grounds therein being that the verdicts were excessive and given under the influence of passion and prejudice. The court denied the motion for

new trial on condition that plaintiff remit $9,000.00 of the amounts allowed by the jury. The plaintiff filed a remittitur reducing the total damages from $24,000.00 to $15,000.00. The motion for new trial was overruled, and judgment was entered for $15,000.00. The court in entering its order of remittitur gave no reason therefor, but its ruling in that respect appears to have been responsive only to the ground of the motion for new trial just stated. We have no doubt that the opening argument made to the jury by counsel for plaintiff aroused the jurors' prejudices and passions and caused them to find verdicts in the amounts stated. Indeed, throughout this whole argument, which appears in full in the record, there seems to be little else in it than an appeal to passion and prejudice. It would render this opinion too lengthy to insert it here. Appellant Rouse, who is a practicing physician at Goodland, was called a crooked doctor. Counsel said the doctor's word was worth nothing. He intimated that the county attorney had a sinister motive in deciding that charges should be filed against Burnham. He referred to Mr. Gregory as having "all the earmarks of a common, ordinary, enthusiastic liar." He said that Mr. Dawson lied on the witness stand, and that "they come on the witness stand and every last one of them perjures himself, in order to save these rascals and scoundrels a few dollars, every last one of them." When the trial opened the witnesses were excluded from the court room; and counsel in his address to the jury stated that a young lady, who had been stenographer for one of the defendants but was not a witness and sat in the court room during the trial, repeatedly went out and talked with the defendant's witnesses, and intimated that she had been kept at the trial by one of the defendants for that purpose. In that connection he said: "Do you believe for a minute that this man Mangus is as poor as he pretends to be, when he can keep a stenographer like that, with a fur coat, and bring her to Topeka and keep her here, and have her carry word to the witnesses?" We find nothing in the record to justify these remarks, and, if they had been true, they were not matters for consideration by the jury. There was no rebuke at any time from the court, and the jury must have thought that the argument was an appropriate one, else the court would not have permitted it. The verdicts of the jury in the total sum of $24,000.00 is evidence of aroused prejudices against the defendants. Conduct of plaintiff's counsel was not only improper, it was reversible error. It is the duty of the court of its own motion to protect litigants from abuse by opposing counsel. New York Cent. R. R. Co. v. Johnson, 279 U. S. 310, 318, 49 S. Ct. 300, 73 L. Ed. 706.

There is another serious question about the four verdicts—Were they for separate damages or were they all for the same damages, and thus quadruplicates? The only difference in the four counts is that in two of them it appears that plaintiff had preliminary hearings on two of the charges and was bound over to the district court, and those charges were there dismissed by the county attorney. The other two criminal charges remained in justice of the peace court. The ad damnum clauses in the four counts are identical. As damages they each alleged: the arrest, imprisonment and prosecution, thereby causing injury to plaintiff's good name and reputation, his humiliation and shame, his impaired health, and injury to his business. We think it must be conclusively presumed that a verdict on the first count included all recoverable damage, both actual and punitive. There was one arrest, one imprisonment, plaintiff had preliminary hearing on that count and there was no proof of damage separately attributable to the other counts. There was in substance but one cause of action, one wrong alleged, and only one verdict should have been rendered. The vital issues were not adhered to, and as a result much incompetent and prejudicial evidence was admitted, some of it over objection. Those errors may not occur on a second trial and will not be further noticed.

Reversed and remanded.