## AUBURN AUTOMOBILE CO. v. HABIG.
### No. 5575.

Circuit Court of Appeals, Seventh Circuit.
June 4, 1936.

tion, alleging that appellant had wrongfully caused the institution of criminal proceedings against him in the state of Florida. The jury returned a verdict in his favor assessing damages at $45,000, which, upon remittitur of $20,000 the District Court approved and rendered judgment in his favor for $25,000. This appeal is from such judgment.

The Auburn Automobile Company is an Indiana corporation engaged in the manufacture of automobiles, and will be hereinafter referred to as defendant. Charles W. Habig, hereinafter called plaintiff, was at all pertinent times the president of Habig Motors Company, hereinafter called Habig Company, a Florida corporation, engaged in the business of selling at retail the product of the defendant at Miami, Fla. The capital stock of this corporation, with the exception of one qualifying share, was owned by the plaintiff and his son Robert.

The uncontroverted facts show that prior to April 9, 1930, an arrangement existed between the Habig Company and the defendant whereby the Habig Company handled the product of defendant upon a cash basis, the details of which are unimportant. Following April 9, a new arrangement was entered into by which defendant shipped its cars to the Habig Company under a so-called "floor-plan"; an arrangement somewhat common to the motor industry. It is agreed by the parties that among other things this plan was one in which the title to the cars remained in the manufacturer, the distributor to have the cars placed on the floor of his place of business and when sold to immediately account to the manufacturer for the proceeds, at least to the amount of the manufacturer's sale price. It was concededly a trust arrangement by which the distributor came into possession of the manufacturer's property, apparently with the privilege, however, of disposing of the same, with the further provision that the funds arising from the sale would likewise be impressed with a trust in favor of the manufacturer until paid. In the instant case, documents were executed by the Habig Company evidencing this arrangement.

In order to properly understand the arrangement between the parties, following April 9, 1930, it is necessary to refer to some of the correspondence between the

Raymond S. Pruitt and John J. Grealis, both of Chicago, Ill., and John W. Eggeman and James P. Murphy, both of Ft. Wayne, Ind., for appellant.

Samuel D. Jackson, of Fort Wayne, Ind., and Marshall F. Sanders and John M. Murrell, both of Miami, Fla., for appellee.

Before EVANS and SPARKS, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

Appellee sued appellant in the District Court for damages for malicious prosecu-

parties and we append in a footnote[1] a letter of April 9, 1930, from plaintiff to defendant, two letters of April 14, 1930, one sent by defendant to City National Bank of Miami, Fla., and the other to the Habig Company, and two letters of June 18, 1930, one sent by defendant to the City National Bank and the other to the Habig Company.

As indicated by the letter of April 9th, the plaintiff had executed and delivered to the defendant on April 2, 1930, a promissory note for $30,000, secured by mortgage deed upon certain real estate in the state of Florida. This mortgage deed recited that it "is given to secure one note for $30,000.00, drawn to Auburn Automobile

---

[1] "Habig Motors Company
"1917–1927 Biscayne Boulevard
"Miami, Florida.
                    "April 9, 1930.
"Auburn Automobile Company, Auburn, Indiana.

"Gentlemen: I am the President and principal stockholder of Habig Motors Company, which is engaged in the sale and distribution of Auburn and Cord automobiles at Miami, Florida. The Habig Motors Company is a corporation which in the course of its business will take out of warehouses, upon trust receipts, automobiles belonging to you, to be paid for when sold, and otherwise incur various debts and obligations to you from time to time. In order to induce you to extend this credit I hereby personally guarantee the prompt payment when due of each and every obligation now owed or at any time hereafter owing from Habig Motors Company to you, whether arising out of the purchase price of automobiles or other merchandise sold and delivered by you to the Habig Motors Company, the conversion of automobiles or property delivered to Habig Motors Company on trust receipt, or otherwise, and whether based upon contract or tort; and to further secure the payment of said obligations, and each of them, when due I am this day depositing with you as collateral security my principal promissory note for $30,000.00 dated the 2nd day of April, 1930, due on or before one year from date, with interest at 6% per annum from maturity, and mortgage securing said note upon the following property located in Hollywood, Florida, described as follows:

"Lots Twenty-three (23) and Twenty-four (24) of Block Twenty-three (23) and Lots Twenty-Six (26) of Block Sixty (60), all of the town of Hollywood, Florida, being a subdivision of all of Section Fifteen (15), Township Fifty-One (51) South, Range Forty-Two (42) East, according to the plat thereof recorded in Plat Book No. 1, page 21, of the public records of Broward County, Florida: said lands situate, lying and being in Broward County, Florida.

"which mortgage has been duly filed for record.

"In case of the non-payment when due of any obligation of the Habig Motors Company to you, I waive all notice of protest or dishonor and presentment for payment, and agree to pay said obligations promptly on demand.

                    "Yours very truly,
                    "(Signed)   Chas. W. Habig
                              "Chas. W. Habig."
"Auburn Automobile Company
         "Auburn, Indiana.
                    "April 14, 1930.
"City National Bank, Miami, Florida.

"Gentlemen: We wired you this morning as follows.

" 'Release today to Habig any car he wants accepting trust receipt and bill of sale trust receipt payable on demand and to be signed by Habig Motors Company with personal indorsement Charles W. Habig and to bear interest six percent Confirming by letter with detailed instructions on further releases.'

"We have entered into a special arrangement with the Habig Motors Company of Miami, our distributor, whereby we will floor plan for them automobiles up to an amount of $30,000.00 on their floor, this to permit them to have on the floor plan a line consisting of 18 automobiles made up of 7 Cords and 11 Auburns.

"In this set up, we grant them this line so they will have the benefit of it, giving them a line of 18 automobiles on their floor if they need it.

"The automobiles will be shipped to ourselves in care of the warehouse company as they have in the past and you will exchange the bills of lading for warehouse receipts, same to be attached to the drafts and held for collection.

"As Mr. Habig needs these cars, this will be your authority to release to him the warehouse receipts accepting in lieu of the warehouse receipt a demand trust receipt together with bill of sale which will permit them to put the cars on their floor.

"The trust receipts which you take from the Habig Motors Company are to be signed by Habig Motors Company and to be indorsed by Mr. Charles W. Habig and to bear interest at the rate of 6% per annum from the time the car

Company, Auburn, Indiana, and signed by Charles W. Habig, which note and mortgage are given to secure an automobile floor-planning arrangement by the said Auburn Automobile Company for the Habig Motors Company of Miami, Florida." While it is conceded by the parties that they were operating under the "floor-plan" arrangement for a time subsequent to April 9, 1930, yet plaintiff asserts that this arrangement was changed as evidenced by the letters of June 18, 1930, and avers that

following that date defendant extended the Habig Company a general line of credit and proceeded from that date forward to sell its cars to the Habig Company without reservation.

The Habig Company became insolvent during the year 1930, and was on the 27th day of December, 1930, placed in the hands of a receiver. Concededly, some of the cars placed with the Habig Company had been sold by them and the proceeds remained unaccounted for to the defendant.

is released to the time the car is paid for. You will hold the trust receipt and bill of sale on each car attached to our draft and remit us the proceeds of the draft when the car is paid for by the distributor.

"We think it much better to have the trust receipt made payable on demand which will assist Mr. Habig in more ways than one rather than for us to place any specified date of maturity on the item.

"Our arrangements have all been completed with the Habig Motors Company on this proposition and we wired you as we did this morning because they wish to take out of the warehouse today one car and we did not wish to delay them in doing this, so gave you the telegraphic instructions we did so the matter might be hurried along.

"This will be your authority to handle all future arrangements on our drafts in this manner up to an amount of 18 cars at any one time, 7 Cords and 11 Auburns.

"We have figured this will give them an approximate line of $30,000.00 and we feel very sure will be of material assistance to these people.

"We hold the highest regard for Mr. Habig and his son and believe them to be careful conservative business men and in consideration of this fact, it is our most earnest desire to co-operate with them in every possible way.

"We trust you will give them all the assistance you can in handling these collections for them as we have outlined and wish to thank you very kindly for the prompt and careful manner in which you have always taken care of our collections in the past.

"If there is anything about our instructions that are not clear to you, kindly advise and we shall be pleased to go into the matter further.

"Yours truly

"B. Snepp, Treasurer.

"B. O. Snepp

"MB/"

84 F.(2d)—4½

"Auburn Automobile Company,
"Auburn, Indiana
"April 14, 1930.
"Habig Motors Company, 1917 Biscayne Blvd., Miami, Florida.
"Attention: Charles W. Habig.
"Dear Mr. Habig:—On receiving your wire this morning, we immediately wired the City National Bank to release to you any car you wanted today accepting a trust receipt and bill of sale.

"We instructed them to make the trust receipt payable on demand and that it bear interest at the rate of 6% from the date the car is taken from the warehouse to the time it is paid for.

"The trust receipt is to be signed by your company with your personal indorsement and have written them as per copy of letter attached giving them detailed instructions as to the handling of these cars.

"There is one other point that comes up in our mind and that is the insurance coverage on the cars while on your floor.

"We can cover these very nicely if you will give us a memorandum of the values on hand on the floor at the end of each month together with the values on hand in the warehouse as you are now doing at the end of each month. We must distinguish in our report to the insurance company between the different locations.

"We have received the abstracts of titles together with mortgage deed and note, all of which appear to us to be in proper form.

"We trust this arrangement will be of great assistance to you and do not hesitate to call on us at any time anything comes up pertaining to this arrangement that does not seem to be working out as it should.

"I believe you will find my instructions to the bank are definite and we will be glad to hear from you occasionally, as to how the bank is co-operating with you on this plan.

"Under date of April 8th we received a letter from the City National Bank which

Upon notice of the receivership proceeding, the defendant employed Miller and McKay, later known as McKay, Dixon & DeJarnette, as its counsel at Miami, Fla. After many consultations with counsel, defendant presented and prosecuted a civil claim in the receivership proceeding which resulted adversely to defendant. Messrs. McKay and Dixon also, as early as February or March, 1931, presented the matter to the prosecuting attorney of Dade county, Fla., which many months later, and in November, 1931, resulted in the filing of an information against the plaintiff, charging him with embezzlement, based upon the sale and failure to account for the proceeds of some of the cars so placed in the possession of the Habig Company. This information was subsequently nolled by the prosecuting attorney and Habig was dis-

was in reply to our letter of the 2nd and for your information we are pleased to enclose a copy of that letter in which Mr. Oliver, Vice-President, states they will be glad to continue your present line on the cars which you now have and this will permit you to liquidate the line as the cars are sold.

"With this statement from the bank and with the plan we have set up for you we see no reason why you should not be able to go along very nicely and we know you will put across a nice lot of business.

"With best wishes to you and your organization, I am

"Sincerely yours,
"B. Snepp, Treasurer.
"BOSnepp
"MB/"

"Auburn Automobile Company.
"Auburn, Indiana.
"June 18, 1930.
"City National Bank, Miami, Florida.

"Gentlemen: Under date of April 14th we wrote you outlining in detail a procedure for the handling of automobiles shipped by us to our order notify Habig Motors Company, Miami, which arrangement provided for floor plan up to an amount of $30,000.00 permitting them to have on the floor a line made up of 7 Cords and 11 Auburns.

"It is now our desire after having talked the matter over with Mr. Robert Habig of Miami, to change this agreement so they may have an additional line of credit on floor plan, this line to consist of a total of $36,000.00 and is to be made up of 7 Cords and 18 Auburns consisting of the following models.
Cords—

"2 Phaetons, 2 Cabriolets, 2 Sedans and 1 Brougham.
Auburns—

"2, 125 Phaetons, 2 Cabriolets and 2 Sedans.

"2, 8/95 Phaetons, 2 Cabriolets, 2 Sedans and 1 Brougham.

"2, 6/85 Cabriolets, 2 Sedans and 1 Brougham.

"They feel this is necessary in order to give them a proper showing of two colors in the various models as outlined.

"This is your authority to change the arrangement now existing so they may have this number of cars on their floor at any one time, but please see the total amount of the floor plan line does not exceed at any time $36,000.00.

"All other provisions are to be just the same as you are now handling them for us and the Habig Motors Company.

"When Mr. Habig was here a memorandum was worked out whereby the total value of the above mentioned 25 cars was approximately $36,000.00.

"Thanking you very kindly for handling this matter as we have now outlined it and awaiting your acknowledgment that you understand the instructions as we have given them, we are

"Yours truly,
"B. Snepp, Treasurer.
"BOSnepp
"MB/
"CC: Habig Motors Co."

"Auburn Automobile Company
"Auburn, Indiana.
"June 18, 1930.
"Habig Motors Company, 1917 Biscayne Blvd., N. E., Miami, Florida.

"Attention: Mr. Charles W. Habig.

"Dear Mr. Habig: Herewith, copy of letter written today to the City National Bank in Miami which will take care of the plan as was outlined by Bob when here sometime ago in conference with Mr. McDarby.

"This should give you a very fine arrangement which we trust will work out very satisfactorily for all of us.

"Will appreciate the favor very much if you will keep us advised once each month as to the number of cars by model, serial number and value which you may have on the floor at that time so we may reconcile it with our records on outstanding items.

"Trusting this arrangement meets with your ideas and with very best wishes, we are

"Yours truly,
"B. Snepp, Treasurer.
"B.O.Snepp
"MB/
"(Enclosed herewith copy of letter to bank.)"

charged, and later brought this suit against the defendant for malicious prosecution.

Defendant tenders twelve assignments of error, the first six dealing with the District Court's failure to direct a verdict for defendant and the alleged excessiveness of both the verdict and the judgment. The last six deal with alleged errors in rulings upon evidence.

Plaintiff concedes in his brief that in order to maintain the action it was necessary for him to prove:

(1) Commencement or continuation of an original criminal or civil prosecution;

(2) Its legal causation by the present defendant against plaintiff, who was defendant in the original proceedings;

(3) Its bona fide termination in favor of the present plaintiff;

(4) The absence of probable cause;

(5) The presence of malice;

(6) Damages therefrom resulting to plaintiff.

The function of this court will be fully performed by a consideration of the question of whether there was any substantial evidence supporting plaintiff's charge of want of probable cause and the presence of malice, as indicated by paragraphs 4 and 5 of plaintiff's assumed burden. The lack of probable cause and the presence of malice depend so much for their establishment upon the same facts and circumstances as to defy separation.

Plaintiff relies to a very great extent in support of these two elements of his case upon the alleged change in arrangements between defendant and the Habig Company by which he asserts that the theretofore existing trust arrangement was abrogated and defendant became nothing more than a seller and the Habig Company nothing more than a purchaser of defendant's products. Indeed, if this be a fact, only the relation of debtor and creditor existed between them, and the plaintiff even though he converted to his own use such property or the proceeds thereof, could in no sense be guilty of the embezzlement of defendant's property.

The letters of April 9 and 14, 1930, heretofore referred to, as well as the subsequent conduct of the parties, fully justify the conclusion that the arrangement at that time was a trust or "floor-plan" arrangement, and that the note and mortgage referred to was to be treated as an indemnity for the faithful performance of such arrangement in all its terms by the Habig Company. The mortgage itself provides that it is given to secure a "floor-plan" arrangement, and on the trial counsel for both sides joined in requesting the court to instruct the jury as a matter of law that such note and mortgage was an indemnifying agreement and not a contract for a line of credit to Habig Company, and that the acceptance of the same by defendant did not change or alter the arrangements theretofore existing. This being conceded by plaintiff, his position with reference to a change in arrangement must therefore stand or fall by virtue of the letters of June 18, 1930. These letters refer to a visit made to defendant's factory by Robert Habig at which time he testified that he requested of defendant a loan of $15,000. It is uncontradicted that he failed to obtain such loan, but the June 18th letters would indicate a concession on the part of defendant in that they had concluded to extend "an additional line of credit on floor-plan" so that the Habig Company would be permitted to have on their floor at one time 7 Cord and 18 Auburn automobiles of the value of $36,000, instead of the former allotment of 7 Cords and 11 Auburns of the value of $30,000.

Plaintiff says that it may be conceded "that prior to this change in the financing plans, automobiles were handled between the parties on a strict title reservation floor-plan," but contends that the June 18 letters extended a general line of credit of $36,000, and that cars thereafter sent to the Habig Company were sent on open account. Plaintiff further asserts that while he concedes that the $30,000 note and mortgage previously given were nothing more than an indemnity to the "floor-plan" arrangement, yet by virtue of the change of June 18, they became security for the general line of credit thus extended as he thinks.

We think the letters of June 18 susceptible of no such construction. Coupled with the conceded status of the parties prior to that date, they very clearly exhibited a purpose to increase the number of cars to be "floor-planned," but in all other respects are an affirmation of the pre-existing status. Plaintiff also refers to the testimony of Robert Habig as to what transpired on his visit to defendant's factory as supporting his position in this respect. We have carefully examined all the evidence

in the record relating to this visit, and find nothing to indicate any recession by defendant from the previously existing trust arrangement.

Our attention is directed by plaintiff to a number of circumstances which he contends show that the parties placed a construction on the June 18 letters in harmony with his interpretation of the same. We have examined these circumstances and find nothing in them justifying any interpretation of the letters different from what we deem to be their plain import. We do find, however, many things in the subsequent conduct of the parties such as the continued shipment of cars by defendant to its own order, the continued execution by the Habig Company of the trust papers with the Miami bank, the repeated checking by defendant of cars on the floor of the Habig Company, in some instances insisting upon a "sight" check of all cars unpaid for, that unmistakably point to the opposite interpretation.

Whether the letters of June 18, together with the note and mortgage referred to, in any manner changed the pre-existing relations of the parties becomes important because the evidence is controverted as to whether such letters and mortgage were submitted to defendant's counsel and by its counsel submitted to the prosecuting attorney before the criminal prosecution was instituted. In our view the legal effect to be given them in no way changed the trust relation of the parties, and it would, therefore, be unimportant whether they were submitted or not. True, had the prosecuting attorney known that defendant possessed security for any defalcation on the part of the Habig Company it may have influenced him in the exercise of what prosecutors sometimes think is a discretion lodged with them whether they will or will not institute criminal proceedings, yet this could not have in any way changed the status of the plaintiff as a law violator if he had otherwise by his conduct assumed such status. Moreover, it could not affect the question of probable cause for belief of guilt on the part of defendant or its agents.

There are many circumstances that stand out in the voluminous record before us, notably, the withdrawal by plaintiff from the assets of Habig Company of seemingly unjustifiable amounts of property and cash immediately preceding the receivership of the Habig Company; the alleged sale of several cars to various members of his family without adequate consideration and at a time when the company was failing; the practice indulged in by him of borrowing cars from his customers and placing them on his showroom floor for the purpose of deceiving defendant, when making a check of cars supposedly unsold, all pointing to a course of conduct inconsistent with fair dealing. We are not unmindful that some of these latter circumstances are disputed by plaintiff and would, therefore, if controlling, present a jury question. We do not, however, deem them controlling; but, if true, they only add an additional reason for defendant's belief that prosecution was justified.

It appearing, as we think, by the undisputed evidence that no substantial change was made in the relationship of the parties from that conceded to be a trust relationship, plaintiff had no legal right to withdraw property of the defendant from the Habig Company and fail to account for the proceeds thereof. His doing so under the circumstances here pointed out constituted probable cause for a criminal complaint.

It cannot be said that the adverse ruling that defendant received in the receivership proceeding was in any sense a motivating factor in the criminal prosecution as neither defendant or its counsel ever conferred with the prosecuting officer after that time, and the facts that they had previously laid before that official had all been given him many months before. It is undisputed that they were unaware what action, if any, was to be taken by the prosecutor until it became publicly known by the filing of the complaint.

Moreover, probable cause being present, it matters not whether defendant was actuated by malice. Lack of probable cause and malice must concur. Stewart v. Sonneborn, 98 U.S. 187, 25 L.Ed. 116; National Surety Company v. Page (C.C.A.) 58 F.(2d) 145; Rouse v. Burnham (C.C.A.) 51 F.(2d) 709.

We believe that under these circumstances no jury question was presented, and defendant was entitled to a directed verdict.

Judgment reversed.