**BALLARD et al. v. UNITED STATES.**

No. 10059.

Circuit Court of Appeals, Ninth Circuit.

Dec. 26, 1945.

Writ of Certiorari Granted March 25, 1946.

See 66 S.Ct. 816.

---

[1] Certainly not any such interpretations which were unpublished before the hearing began.

942

DENMAN, Circuit Judge, dissenting.

———◆———

Roland Rich Woolley, Joseph F. Rank, and Ralph C. Curren, all of Los Angeles, Cal., for appellant.

Tom C. Clark, Asst. Atty. Gen., Robert S. Erdahl, Sp. Asst. to Atty. Gen., Beatrice Rosenberg, Atty., Dept. of Justice, of Washington, D. C., and James M. Carter, Asst. U. S. Atty., of Los Angeles, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appellants were convicted and sentenced for the violation of 18 U.S.C.A. § 338, the statute which prohibits the use of the United States mails in fraudulent transactions. Upon appeal to this court the judgment of conviction was reversed, Judge Stephens dissenting, 1943, 138 F.2d 540. In the course of the trial, the court ruled that inquiry into the truth of certain claimed happenings and powers of certain persons would encroach upon the field of religion and that the issue before the jury was not as to the truth of the claimed happenings or powers but was as to appellants' belief in them. A statement of this import was given the jury after conference in chambers between the presiding judge and counsel for all parties. This theory of the issue was adhered to consistently throughout the trial and in counsel's addresses to the jury and was incorporated in the judge's charge to the jury. Throughout the trial the record discloses no objection by either party to such treatment of the issue; rather it shows complete agreement therewith. Only later did counsel for defendants claim error in regard to it. The majority of this court reversed upon this point alone although there were other points in the appeal.

Upon certiorari from the United States Supreme Court this court was reversed by a divided court, United States v. Ballard, 1944, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148. Mr. Justice Douglas wrote the prevailing opinion, which was concurred in by Mr. Justices Black, Reed, Murphy, and Rutledge. In his opinion Mr. Justice Douglas held that counsel had agreed to try the case under the ruling above referred to and held that the court was right in not permitting the trial as to the truth of the claimed happenings or possession of claimed powers and would have been right even in the absence of an agreement to that end. He left unruled upon, the question whether or not such construction of the issues effected an amendment to the indictment. The case was remanded to us to rule upon these and all other questions not treated in the prevailing opinion.

Mr. Chief Justice Stone dissented in an opinion concurred in by Mr. Justice Roberts and Mr. Justice Frankfurter. The Chief Justice with his concurring associates thought there was no error in the trial and held for a reversal of this court and the affirmance of the conviction. Mr. Justice Jackson was for a flat reversal of the conviction and dismissal of the cause upon the ground that neither the truth of a religion nor the genuineness of a professed belief in a religion can be the subject of a court inquiry. Such is the posture of the case as it reached us for our second consideration.

Upon our second consideration we gave the record, briefs, oral argument, and especially the several expressions of the Jus-

tices, earnest study, and a majority came to the conclusion that the judgment of conviction should be affirmed. Also, in view of the fact that the members of the Supreme Court had given divergent expressions as to their views of the case, we chose to depart from the custom of writing an opinion, and so we confined ourselves to conclusions. Judge Denman was not in agreement with the majority and he wrote an opinion fully discussing the several issues of the case.

This court is now under the necessity of ruling upon a petition in which appellants urge that we grant a rehearing and after a rehearing that we express our views upon the several issues of the case. We yield to this plea in part, by expressing ourselves upon the issues, but because we see no need for further hearing and because, after further consideration, the majority adheres to its decision, we deny the petition for rehearing.

■ The Chief Justice, with his concurring associates, in voting to affirm the conviction, necessarily considered and passed upon every issue raised upon appeal. Insofar as the final outcome is concerned, his opinion was in no wise in conflict with that of Mr. Justice Douglas. Mr. Justice Douglas not only found that counsel for all parties had agreed to the trial court's expression on the religious phase of the case but held that the expression was legally correct. The Chief Justice passed the point with the following comment (322 U.S. at page 90, 64 S.Ct. at page 888, 88 L. Ed. 1148, his opinion, supra): "Obviously if the question whether the religious experiences in fact occurred could not constitutionally have been submitted to the jury the court rightly withdrew it. If it could have been submitted, I know of no reason why the parties could not, with the advice of counsel, assent to its withdrawal from the jury."

No member of the Supreme Court has used language decisive of the case which conflicts with that of the Chief Justice, except Mr. Justice Jackson. In the latter's dissenting opinion it is held that there is no propriety in submitting the sincerity of a professed belief to a court for decision. Upon that phase of the case the Chief Justice says (322 U.S. at page 89, 64 S.Ct. at page 888, 88 L.Ed. 1148, supra): "With the assent of the prosecution and the defense the trial judge withdrew from the consideration of the jury the question whether the alleged religious experiences had in fact occurred, but submitted to the jury the single issue whether petitioners honestly believed that they had occurred, with the instruction that if the jury did not so find, then it should return a verdict of guilty. On this issue the jury, on ample evidence that respondents were without belief in the statements which they had made to their victims, found a verdict of guilty. The state of one's mind is a fact as capable of fraudulent misrepresentation as is one's physical condition or the state of his bodily health." It is worthy of note that the Chief Justice suggested that there were points in the case distinct from any religious note and that the case could not be affected by any ruling relating exclusively to religion.

The Chief Justice treated other issues raised upon appeal, among them the effect upon the indictment of the court's questioned instruction. He found no error and did not doubt the indictment's continued validity. It may sound presumptuous, for us as members of an intermediary court to say that we regard the Chief Justice's treatment of these questions as satisfactory and as errorless.

■ Two points upon appeal were not mentioned in any one of the opinions written by members of the Supreme Court, and each is regarded as decisive by our dissenting associate. He thinks the conduct of the district attorney in his argument requires reversal. It is our opinion that if the conduct of the prosecution in argument in this case constitutes error, then, the prosecution in every case is limited to a listless, vigorless summation of fact in Chesterfieldian politeness. Gone are the days of the great advocates whose logic glowed and flowed with the heat of forensics! Gone, except for counsel for the defense. Courts, jealous of the rights of the accused as well as with an eye to the appeal if the government wins, will seldom admonish defense counsel in his lachrymal appeal for a verdict of acquittal notwithstanding the evidence of guilt. Even yet will the district attorney be tried instead of the defendant and be found guilty by the defense attorney as having prostituted his superior mind to heartless persecution. We think that seldom will an innocent man unjustly become a convict through the heat and overstatement

944

of a district attorney but the guilty will no doubt escape his just deserts if the district attorney is unduly restricted.

Counsel in opening argument told the jury: "The government claims in this case though, gentlemen, that this Ballard racket, as we might refer to it now in argument, is a flim flam scheme that has been unparalleled in history. These defendants have been the most successful fakers in the knowledge of the history of fakery, and I think that is a tribute to the principal organizer Edna W. Ballard." To this statement defense counsel objected but declined to elaborate upon his objection. The court told the jury that it was going to permit fullest argument, and that counsel may at times overstep themselves in the heat of argument, and that the jury should use its best judgment, having heard the evidence. Looking at the evidence from the prosecution standpoint, the expression objected to is mild.

The defendants claim at least to believe that they can do, and have done, and have experienced more extremely remarkable and unusual things than any other persons in history—things all the way from religious miracles to what generally have been referred to as charlatanry, black magic, love potions, et cetera. Justice Jackson, who would dismiss the case upon legal-philosophical reasons, does not restrain himself in expressing his view of the evidence when he says in the formality of an official opinion: "I should say the defendants have done just that for which they are indicted. * * * I can see in their teachings nothing but humbug, untainted by any trace of truth." Nothing said by government counsel bites as deeply as this statement.

■ In his closing address Mr. Neukom of government counsel says: "Let your verdict be a warning to those people who would be religious racketeers. Let's clean out the money-changers from the temple." Again he said: "We have toleration and feeling for all people, and I have it for them. It isn't pleasant to prosecute people, and don't think it is. Mr. Cannon (for defense) said the hard side is the defense. Gentlemen, if you have a heart in you, it isn't entirely so. It is hard to prosecute people, and that is true." Again: "We have just got human concepts, gentlemen. I don't want you to be intolerant of these people, but I want you to use your good sense." One counsel for the prosecution

referred in argument to the precipitation of gold, jewels, et cetera. It is claimed that thereby he violated the instruction of the court in regard to religious matters, but it is not hard to see the difference between this claimed power and the claimed intimate association with Jesus and saints. If one claims to be able to precipitate gold, that is, just get it from where it is not, the gold would remain visible proof of the claim. But if one were to be put to his proof that he "walks with Jesus," the burden would be very different if not impossible to carry. Defendant-appellants in this case were relieved from such difficulty since the extent of the requirement was that they at least should believe in the truth of the remarkable things they taught, and got money for, and in connection with which they used the United States mails.

We discern nothing in counsel's argument on either side not fully within the concepts of honorable members of the American bar.

■ Our dissenting associate holds that it was reversible error for the trial court to proceed to trial with a jury selected from a jury list made up intentionally of males only. As heretofore stated, the point was raised and presented to the Supreme Court and was given no mention in any of the Justices' opinions. In the circumstances of this case we find no error.

The petition for rehearing is denied.

DENMAN, Circuit Judge (dissenting).

I dissent not only from the decision but also from the refusal of this court to respond to the requirement of the Supreme Court that we not only should "pass on" the important questions raised but not decided in that court, but, in addition, give that Court the "benefit of our views" upon them.

The language of this requirement is:

"Respondents maintain that the reversal of the judgment of conviction was justified on other distinct grounds. The Circuit Court of Appeals did not reach those questions. Respondents may, of course, urge them here in support of the judgment of the Circuit Court of Appeals. * * * But since attention was centered on the issues which we have discussed, the remaining questions were not fully presented to this Court either in the briefs or oral argument. In view of these circumstances we deem it more appropriate to remand

the cause to the Circuit Court of Appeals so that it may *pass on* the questions reserved. * * * If *any questions of importance survive* and are presented here, we will then have the *benefit of the views* of the Circuit Court of Appeals. Until that additional consideration is had, we cannot be sure that it will be necessary to pass on any of the other constitutional issues which respondents claim to have reserved." (Emphasis supplied.) United States v. Ballard, 322 U.S. 78, 88, 64 S.Ct. 882, 887, 88 L.Ed. 1148.

It is obvious from the decision of this court that three constitutional questions of importance, later considered, survive for the consideration of the Supreme Court.

I dissent from the language of this court desiccating the Supreme Court's requirement to the point where this court is to do no more than "rule upon" the questions remanded to us for our views.

The Supreme Court has held that because Mr. and Mrs. Ballard have the freedom of religion created by the First Amendment they are not free to prove that they have experienced and participated in certain divinely derived "happenings" to prove that they honestly and in good faith believed they had happened.

Since the Ballards are not free to make such obviously powerful and persuasive proof of their good faith, the record presents three questions of claimed violations of the constitutional rights of appellants, ably and cogently argued by their counsel. All three are concerned with the due process clause of the Fifth Amendment and two of them with the freedom of religion provision of the First Amendment.

(A) Though denied such freedom of proof of such happenings, the trial court not only permitted the jurors to ask whether such claimed divine happenings had actually occurred but itself asked a witness whether he had participated in one of them, and then stated that counsel would be permitted to argue to the jury the question of whether there had been such happenings. This was followed by calculated bitter repeated denunciations of the Ballards because they had not only failed to make proof of the miraculous occurrence in the past but also because they had not caused it to occur before the jury during the course of the trial.

This violation by the court of the dominant ruling of that court excluding such

evidence was accompanied (a) by a questioning of Donald Ballard as to his participancy in another miraculous occurrence and critical comment on his answer, with (b) a sneering mockery of appellants' belief in the divine power of ascension of the body of a human being; (c) by a demand for a conviction because, the prosecuting attorney assured the jury, there had been a conviction in what to his knowledge had been a similar case decided 25 years before; (d) by a further demand for a conviction to keep up the morale of the troops fighting abroad in the world war, with (e) repeated mocking and degrading characterizations of the appellants.

This succession of violations of the rights of the defendants continued over two days and two noon recesses. The intervening deliberations in the recesses and overnight continuance led to no withdrawal by the prosecution of any of the previous abuses or false issues raised. Instead they continued through the closing argument. Here is no single unfair act, possibly excusable in the heat of argument as is suggested in the opinion of the court. Here are two days of deliberate and continued striking of the unfair blows of Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314, and Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 87 L.Ed. 734.

I dissent from this court's ruling against this claimed error in the prosecution's process without stating any of the facts of such unfair conduct, set forth in appellants' briefs, or giving the court's views on any of the many cases in the Supreme and other federal courts sustaining appellants' contentions as to each specified abuse of that process.

I further dissent from the court's characterization of such accumulating abuse of the process of federal or any Anglo Saxon prosecution as being fully "within the concepts of *honorable* members of the American bar." Though understandable and perhaps in individual instances excusable, it is not commendable conduct within the concepts of the factory, the forecastle or Lord Chesterfield's drawing room.

In this respect, without minimizing the right of the Ballards to a reversal on this ground, one must consider on behalf of both the judge and the prosecutors the peculiar mental difficulty in separating the

fact of miraculous experiences from a belief that they occurred. The trial court's ruling, with which a minority of four justices appear to disagree, is an extraordinary one of first instance. It is not surprising that that court, as also the prosecution, seemed to find it mentally impossible to make the distinction of which Justice Jackson in his dissent says,

"In the first place, as a matter of either practice or philosophy I do not see how we can separate an issue as to what is believed from considerations as to what is believable. * * * If we try religious sincerity severed from religious verity, we isolate the dispute from the very considerations which in common experience provide its most reliable answer."

United States v. Ballard, supra, 322 U.S at pages 92, 93, 64 S.Ct. at page 889, 88 L. Ed. 1148.

(B) The second "important question" referred to us for our "views" is the abuse of the prosecuting process by the exclusion by the court's order of all women from the jury panel. Appellants' briefs cogently and forcefully present their argument and supporting authorities that here was absence of due process within the Supreme Court's decision in Glasser v. United States, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L. Ed. 680.

This court not only does not give its views on the Glasser case but does not even mention it. Its opinion states: "Our dissenting associate holds that it was reversible error for the trial court to proceed to trial with a jury selected from a jury list made up intentionally of males only. * * * In the circumstances of this case we find no error." I dissent not only from this refusal of the court to state its views for the benefit of the Supreme Court but from what, in effect, is a majority opinion cast in the form of a bald dissent from a reasoned dissenting opinion.

(C) A third question is whether it is not a denial of freedom of religion and of due process to indict defendants upon the charge of not "honestly and in good faith believing those things," i.e., such things miraculously experienced as the shaking of the hand of Jesus, where, because of the

defendants' freedom of religion, they are not free to introduce the most persuasive proof of their honesty and good faith—that is, that they actually participated in the miraculous happenings.

This court nowhere considers this contention but confines itself to the view of a three-justice minority that the Ballards consented to be tried without evidence of such miraculous happenings and hence the indictment, construed as raising only the question of good faith in belief, is valid. I dissent from the failure of this court to give its views on this contention of the indictment's invalidity, assuming that by agreement of the parties it is to be construed as charging no more than stated in the opinion of the Chief Justice.

Entirely apart from the requirement of the Supreme Court for our views on these important questions in this extraordinary case, I dissent from the refusal of this court to give its views in a considered opinion upon such contentions cogently urged here in any appeal—a fortiori in a criminal appeal. Six of the seven states of this circuit have enacted laws requiring their appellate courts to render such opinions on the rulings they make.[1] The refusal to give our views in a reasoned opinion establishes a precedent, not only violative of our established practice but to the established practice of all the states of the circuit and of the Supreme Court and other federal appellate courts.

In response to the Supreme Court's requirement there follows the expression of my views on the three constitutional questions which, under this court's decision, survive to the appellants for their assured consideration on a second writ of certiorari.

A. *The misconduct of the prosecution in attacking the defendants for not proving before the jury or elsewhere the miraculous occurrences they were forbidden by the court to prove, and in other respects, violates due prosecuting process as well as the accuseds' freedom of religion and constitutes reversible error.*

Under the holding of the Supreme Court that miraculous experiences could not be proved as facts to support appel-

---

[1] California: Constitution, Article VI, § 2, § 4a; Idaho: § 1-205, Idaho Code Annotated 1932; Montana: §§ 8801, 8805, Revised Codes of Montana 1935; Nevada: § 8381, Nevada Compiled Laws 1929; Oregon: Constitution, Am. Art. VII, § 4; Washington: Constitution, Article IV, § 2. In Arizona, the seventh state, it is the practice of the supreme court to render such opinions.

lants' belief in their miraculous powers, the statements of the prosecution appear so highly prejudicial that there should be a reversal and a new trial. The prejudicial statements concern the absence of the proof of two of the miraculous happenings. They constitute a denial of the appellants' freedom of religion as that Court interprets that portion of the First Amendment.

Of the eighteen facts constituting the misrepresentations of the indictment, the Supreme Court held "The false representations charged were eighteen in number. It is sufficient at this point to say that they covered respondents' alleged religious doctrines or beliefs."

One of these statements of "religious doctrines or beliefs" is in paragraph (9) of the portion of the indictment describing the conspiracy to use the mails to defraud, as follows:

"(9) That the defendants, and each of them, further represented as a part of said scheme and artifice to defraud the persons intended to be defrauded; that the three designated persons, to-wit: Guy W. Ballard, Edna W. Ballard, and Donald Ballard, *had a divine and supernatural ability to bring forth from a supernatural state, money, riches, and other material needs necessary to mankind,* which power or condition and supernatural state the defendants represented that they could transmit to others willing to pay therefor or willing to part with things of value therefor; whereas in truth and in fact *the above designated defendants well knew* that none, neither, nor all of them had any such supernatural power or ability of *precipitation* and all of said representations were false and fraudulent." (Emphasis supplied.)

The Supreme Court upholds the district court's ruling excluding from the jury evidence concerning "representations and statements [of miraculous experiences which] might seem highly improbable to many people" and that "Whether these [highly improbable] incidents *actually happened* or not is not for your consideration," and "They [the jury] are not going to be permitted to speculate on the actuality of the happening of those incidents." (322 U. S. at page 81, 64 S.Ct. at page 884, 88 L. Ed. 1148.)

Despite this warning of the district court to the jurors, they were speculating on the "highly improbable" divine and super-

natural ability of precipitation from "a supernatural state, money, riches, and other material needs." From the jury box one of them asked of one of the defendants, "I have one question. I just wanted to ask the witness if he ever precipitated anything." The witness' answer did not satisfy the juror and he repeated, "Answer my question. Did you precipitate anything?"

Whereupon the court abandoned its ruling excluding evidence upon which the jury could "speculate" "whether these incidents actually happened." Instead of declaring the question of the happening of the fact of such a "divine" miracle as irrelevant and its pursuit a denial of the accused's religious liberty, the court itself asked, "Did you yourself ever precipitate?"

The charged conspirator's answers are irrelevant to the issue of the area the questions showed to the jury to be open to their consideration. Colloquy ensued and the juror stated, "Isn't that something different from what we have been talking about as precipitation?" The court then ruled, *"That is going to be a matter for the attorneys on both sides to argue to the jury, and that* [the fact of precipitation] *will be a matter for you gentlemen to decide."*

When it came to the argument, one of the prosecuting attorneys availed himself of this license of the court as to the area of discussion. Referring to one or more of the alleged conspirators, he made the following sneering remarks about the absence of any proof of such divine and supernatural happening as the precipitation of precious metals:

"Betty Mundy has no doubt, Louise Majerus has no doubt, Donald Ballard is one of the accredited messengers of the ascended masters, and he certainly has no doubt, and Mrs. Ballard, as the big-wig, the chief of the entire organization, certainly could have no doubt whatsoever—to say nothing of William Cassiere and Paul Stickell, those traveling salesmen for the Ballards, they certainly would have no doubt—yet gentlemen, *have they managed to precipitate gold or jewels?* If they have, I submit that *we should have been told about it here in court. Possibly we should have had an example of such precipitation shown us."*

"* * * He himself *had not been able to precipitate,* apparently because he was not sufficiently pure. That same dog chas-

ing the same tail. And yet Paul Stickell was sufficiently pure to be appointed a messenger of Saint Germain."

" * * * and I submit, gentlemen, that if it is such that the Ballards, as the accredited messengers of the ascended masters, those mighty people who have never made any mistakes, those perfect beings *should have been able to precipitate* and *should have been able to precipitate some of their needs* instead of taking money from poor people who had given much more than frequently they could afford to this movement through love gifts and through the purchase of books." (Emphasis supplied.)

Again, disregarding the court's ruling regarding the truth of such a miraculous happening, the prosecution built an argument upon Donald Ballard's denial that he in fact had ever ascended. Also, to meet the statement of Mr. Ballard, Sr., as to their communion with the ascended master, St. Germain, that "Mrs. Ballard and Donald and I have stood in the visible, tangible, presence of our blessed ascended master Saint Germain many, many times," the prosecution stated to the jury, "Now, did *Donald Ballard have these experiences* or didn't he? One of the reasons *we know he didn't have these expriences* was that he wasn't the practiced and experienced actor that Mrs. Edna W. Ballard was." (Emphasis supplied.)

Again, against the excluded issue of the actuality of the happenings, the prosecution in its opening argument claimed the evidence failed to show that Mrs. Ballard "actually did associate with the gods" in the following argument: "Now, of course, if Mrs. Ballard actually did associate with the gods, you can well understand how these various people that joined the movement would join the movement and would stay in the movement; but *I don't think she did,* and *I don't think the evidence shows that she did.*" (Emphasis supplied.)

In the closing argument this was reiterated in the statement, "People were told that if they would follow these teachings they would ascend, and they knew they couldn't. And that is a bad faith. *There isn't anyone that has ascended that you know of here.*" (Emphasis supplied.)

As to the supernatural power of healing the sick, charged in the indictment as construed by the Supreme Court as no more than something claimed but not believed,

the prosecution again taunts the Ballards with failing to prove the *fact* of such divine healing by "producing witnesses who had actually been cured" and who "were grateful to the Ballards for curing these incurable diseases."

As a climax to such violation of the denial of the proof of the miraculous happenings, *the prosecutor offered in argument his own testimony* that one such alleged happening had not occurred, stating "Now, what a cosmic light is, I don't know, but it sounds like a cataclysm to me. And *I know I was here in Los Angeles on July 1, 1938, and July 17, 1938,* and cataclysm or not, *I know that there wasn't any great wave of cosmic light striking at the Shrine Auditorium or any other place here at that time.*" (Emphasis supplied.)

Later, in the closing argument, the prosecutor again offered *his evidence* of the conviction of persons similarly charged and suggests a like conviction, stating "About 25 years ago in California there was a group of people—I think two— prosecuted for mail fraud. They claimed to be the sons of God, that they had the power of Moses and Elijah, that the mantle of Jesus had fallen on them, that they had the keys to the kingdom of heaven. *They were prosecuted and they were convicted,* gentlemen. There are others. This is nothing unusual. And *this is going to be one more on that list, I believe.*" (Emphasis supplied.)

As to the claimed supernatural power to ascend, a part of defendants' claimed religious belief, the prosecution mockingly describes it as "Ascension was an exciting painless and adventurous sort of thing. You wouldn't have to pass through death, at least at first, until Mr. Ballard became quite ill and it was evident that he was going to die; you just sort of rise up in the air and would be able to come back and forth as you desired, become invisible or visible, as you wished. *Superman* does that frequently, and it is a very interesting and exciting sort of thing * * *."

And this under the instruction of the court that "the religious beliefs of these defendants cannot be an issue in this court."

To complete the succession of violations of due process by the prosecution, one of the prosecutors finished his argument by proposing a conviction because we were then at war. "You gentlemen are trying

this case—this important case I might add —in very unusual times. *The country is at war.* And a case of this sort makes it devolve upon you here to see that the defendants are convicted if you find that they are guilty of fraud *so that those who are fighting for our country will find that they have something to come back to worth fighting for."* (Emphasis supplied.)

Having thus discussed the actuality or nonactuality of these events in the area so licensed by the court, though the discussion of such happenings as facts is held by it and the Supreme Court as an invasion of the religious freedom of the accused, the prosecuting attorney repeatedly followed that discussion with such intemperate and highly prejudicial denunciations of Mrs. Ballard as "glib" and an "adept prevaricator;" as "the most successful faker in the history of fakery," "a cheat," "a charlatan" and "a religious racketeer."[2]

If the proof of the facts of a divine precipitation or ascension had been permissible, such denunciations possibly would be within the prosecutor's extension of his privilege as established in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. Here they are poisonous additions to an argument, based in large part upon statements which, under the holding of the Supreme Court, are so violative of the accuseds' right of religious liberty.

At the beginning of the argument to the jury the district court, in overruling appellants' first objection to the character of the prosecution's argument, concluded by stating "In the heat of argument on both sides counsel will probably make remarks that do not fully conform to the evidence. Lawyers will do that, and even individuals will do that in the heat of argument. I just give you that general caution, and I think with the good sense and intelligence of the jury, if you find that extreme or extraordinary statements have been made, that you will disregard those statements and only pass judgment upon the evidence *as interpreted by counsel."*

What was evidence so to be "interpreted" obviously included the facts of ascension and of precipitation, upon which the court itself and one of the jurors had interrogated one of the witnesses. Since the jury was thus at the beginning of the argument advised that it was to "pass judgment upon the *evidence as interpreted by counsel,"* here was announced license to comment upon the evidence of such divine supernatural *facts* as the ascension of the body and precipitation.

Clearly, this is a case where the truth as to religious experiences entered the area of passion and prejudice which the Supreme Court's decision sought to avoid. It is such a case as Viereck v. United States, 318 U.S. 236, 248, 63 S.Ct. 561, 566, 87 L. Ed. 734, where the Supreme Court held of such "passion and prejudice" that counsel's discourse on it should have been stopped by the court "without waiting for an objection."[3]

To the suggestion that the instant case is so strong against the Ballards that the Viereck case does not apply, the an-

---

[2] In the following cases were reversals for such language: Volkmor v. United States, 6 Cir., 13 F.2d 594, 595; defendant called a "skunk," a "cheap, scaly, slimy crook." Rouse v. Burnham, 10 Cir., 51 F.2d 709, 713; physician called a "crooked doctor," defendant had "all the earmarks of a common, ordinary, enthusiastic liar," parties were "rascals and scoundrels." London Guarantee Co. v. Woelfle, 8 Cir., 83 F.2d 325, 339; doctors "stood there like a bunch of sharks."

[3] "At a time when **passion and prejudice** are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury were highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted. We think that the trial judge should have stopped **counsel's discourse without** waiting for an objection. 'The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633; 79

swer is that to any of the jurors having a religious belief in miracles it well would appear a weak one. The effect of the devastating attack of the prosecution is not to be measured by non-belief in the miracles of the Bible or the mormon Joseph Smith.

It is my view of such misconduct that it requires the reversal of the judgments convicting the Ballards.

(B) *It is a violation of the due process clause of the Fifth Amendment and impartial jury clause of the Sixth Amendment for the clerk of the court and the jury commissioner, on the order of the court, to exclude from the jury lists one-half of all the persons—that is all the women— eligible for the trial of a mother and son on the charge of misrepresenting their religious beliefs and experiences miraculous in character.*

It is admitted that all women were excluded from the grand and petit jury lists from which the grand jury indicting and the jury trying the Ballards were selected. It was stipulated that the discrimination was intentional—that is with the approval of the court of the Southern District of California. Cf. Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497.

The Ballards contend that due process in the trial of an indictment of a woman and her son for conspiring together to misrepresent as to their religious beliefs requires the district court's clerk and jury commissioner not so to discriminate against all women in making up the jury lists.[4] It is a matter of indifference whether this claim is based upon the Fifth or Sixth Amendments. It is obvious that they have been denied due process in the jury-constituting portion of the prosecuting process if

---

L.Ed. 1314. Compare New York Central R. Co. v. Johnson, 279 U.S. 310, 316, 318, 49 S.Ct. 300, 302, 303, 73 L. Ed. 706." (Emphasis supplied.)

That the court sua sponte should have stopped such argument is held in the following cases: Pierce v. United States, 6 Cir., 86 F.2d 949, 952; Volkmor v. United States, 6 Cir., 13 F.2d 594, 595; Rouse v. Burnham, 10 Cir., 51 F.2d 709, 713; London Guarantee Co. v. Woelfle, 8 Cir., 83 F.2d 325, 344; Aetna Life Ins. Co. v. Kelly, 8 Cir., 70 F.2d 589, 594, 93 A.L.R. 471.

4 The Ballards' motion to quash the indictment on the ground of this discrimination was denied. At the opening of the trial the entire jury panel was challenged on the same ground. The challenge was overruled and an exception taken. At the close of trial a motion for a dismissal on both grounds was made and denied. Exceptions were taken. The denials of the district court of the motion to quash and the motion to dismiss were here assigned as error.

The opening brief on appeal here reserved the constitutional questions involved by assigning the above claimed errors as relied upon, but at the first hearing here they were not pressed. On the second hearing they were fully briefed by the Ballards and the prosecution. The prosecution now seeks to prevent our consideration of the constitutional questions involved on the ground that, though reserved as assigned error in the first brief, their detailed consideration was not given until the filing of the supplemental brief.

The Supreme Court does not so treat defenses in criminal cases based upon

one of the Bill of Rights amendments, even where they were not, as here, presented to the trial court and reserved to the appellate court by assignment of error. Weems v. United States, 217 U. S. 349, 362, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann.Cas. 705. If there be error here, " * * * it was plain error of such a fundamental nature that we should notice it." Sibbach v. Wilson, 312 U.S. 1, 16, 61 S.Ct. 422, 427, 85 L.Ed. 479. Our own rule is that even where there is no motion for a directed verdict we will consider an error reserved here by assignment "far enough to see there has been no miscarriage of justice." Giles v. United States, 9 Cir., 144 F.2d 860, 861; Marco v. United States, 9 Cir., 26 F.2d 315, 316.

The government also seeks to prevent the consideration of the constitutional questions, claiming that an order denying a motion to quash an indictment on account of discrimination in the membership of the grand jury is not an appealable order. It relies upon two cases in this court, Conway v. United States, 9 Cir., 142 F.2d 202, and Tudor v. United States, 9 Cir., 142 F.2d 206. In both these cases the ground of the motions to quash was a defect on the face of the indictment and hence subject to demurrer. If they are construable as applying to a motion to quash on the ground here urged, they are overruled by Glasser v. United States, 315 U.S. 60, 64, 62 S.Ct. 457, 86 L.Ed. 680, where the Supreme Court considered the claim of error in the composition of the grand jury on appeal from a denial of the motion to quash the indictment.

the lists are not valid under the requirements of the Sixth Amendment.

That Amendment requires that the jury shall be a "body truly representative of the community;" that it is "not the organ of any special group or class" and made up without "tendencies, *no matter how slight,* toward the selection of jurors by any method other than a *process* which will insure a trial by a representative group." (Emphasis supplied.) Otherwise the selection of the jury will be one of the "undermining *processes* weakening the institution of jury trial" which "should be sturdily resisted." Glasser v. United States, 315 U.S. 60, 86, 62 S.Ct. 457, 472, 86 L.Ed. 680.

This statement of the law was made in considering whether the Sixth Amendment was violated by the omission of all women from the grand jury and nearly all women from the trial jury lists. It is inconceivable that the Supreme Court was speaking in vacuo.[5] To me the Glasser statement makes clear that *today* the "impartial jury" of the Sixth Amendment has as one of its determinants the character of the grand and trial jury lists as "truly representative of the community" with respect to the exclusion therefrom of qualified women.

Like all such progressive concepts of the area and content of the Bill of Rights, it is quite likely the founding fathers would not have recognized the validity of this statement of the law.

It is also a fact that in California women have participated in the governmental function of indictment by grand juries and trial by petit juries for twenty-eight years. Cf. In re Mana, 178 Cal. 213, 172 P. 986, L.R.A.1918E, 771.

The realization of the contribution of women to the public affairs of the state and nation was a gradual growth. The recognition of the accompanying constitutional rights is also a "gradual process." As stated by Chief Justice Hughes of the attempt to fix such rights as those of "due process" by mathematical formulae, such formulae "are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the *gradual process of inclusion and exclusion.*" Santa Cruz Co. v. Labor Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954. (Emphasis supplied.)

One does not need to read Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L. Ed. 551, 13 Ann.Cas. 957, or the many regulations in the statutes of the states of this circuit for maximum hours and establishing a minimum wage for women to realize the basic differences in social function between men and women in our social life. What is here pertinent is that women bear children. In the average family from which jurors are drawn, the souls of children in their infant and early adolescent bodies receive the first and most lasting teaching of religious truths from their mothers. In the same families the major social function of men is concerned with the creation of material things, largely food and clothing and housing of the children's bodies.

In the public schools over ninety-five per cent of the primary and grammar school teachers are women. In the churches of all religions the numbers of women attendants on divine service vastly exceed men. The one large and vital religious group created in America since Joseph Smith is that of the Christian Scientists founded by a woman, Mary Baker Eddy.

The excluded statements[6] of Mrs. Ballard to the Postal Inspectors as to her

---

5 Similarly this court in the recent case of Thiel v. Southern Pacific Co., 9 Cir., 149 F.2d 783, 786, disposed of the claimed unconstitutionality of a federal jury because there was purposefully a larger number of women than men on the jury—not on the ground that this was a matter of indifference, but on the facts.

6 "Mr. Callahan [Postal Inspector]: Just what do you mean by that?

"Mrs. Ballard: The dictation of the instruction contained in the books, which is the subject matter of the law that we teach; the same as a teacher would dictate a problem in arithmetic for the class to copy and go home and work out. The ascended master Saint Germain dictated these to Mr. Ballard in my presence in Chicago. Saint Germain came in a tangible body. You can't say a physical body because it is not, because it doesn't vibrate with the same density or radiation of our physical flesh, but it is a solid tangible body. You can shake hands with it. The ascended master lives in a visible, tangible body of substance that you can shake hands with,

religious experiences, quite likely could be regarded by woman jurors to be as much from the inspired influence of Jesus on a sincere and devoutly sainted person as many of the followers of Mary Baker Eddy regarded hers. It matters not that from my viewpoint there is other testimony of a conspiracy so mean and vile that it warrants some of the strongest strictures of the prosecution. I am not a woman juror sitting in the Ballard trial, who is the mother of five children at whose knee have been instilled in them the teachings of Jesus as interpreted by Mrs. Eddy.

Well could a sensitive woman, highly spiritual in character, rationalize all the money income acquired by Mrs. Ballard as being devoted to the teachings of the same Jesus as are the profits of the trust created by Mrs. Eddy for the Christian Science Monitor. From what the violently prejudiced and often bigoted critics of Mrs. Eddy have said in the historic attack upon her and the sect she founded, she as well as Mrs. Ballard could have been indicted under the mail fraud statute and been denied the right to testify as to her religious experiences.

The government argues that certain California cases have held that it is not reversible error in California to exclude all women from the grand and petit jury lists. These cases are well summarized in the opinion of Judge Yankwich in United States v. Ballard, D.C., 35 F.Supp. 105, 107, where another indictment of the Ballards by a preceding grand jury was unsuccessfully sought to be quashed on the ground of the absence of women from the grand jury list. That case is not res judicata, since there was no decision against the Ballards from which they could appeal.

Judge Yankwich's opinion was written before the decision in the Glasser case, supra. It fails to consider the statements of the California supreme court in the last of these cases, People v. Parman, 14 Cal. 2d 17, 20, 92 P.2d 387, 388, where, after stating that in California the requirement that qualified women should be placed on jury lists is directory and not mandatory, it is said "Failure of substantial compliance [with the requirement] has not been shown *nor does any prejudice to the rights of the defendant appear.*" (Emphasis supplied.) The absence of prejudice there is apparent from the facts that appellant was a man tried by a jury of men on a charge of murder.[7] What is important in this latest

---

but it is far finer and more perfect than our own. It looks like a physical body to your physical eyes. Saint Germain is one of the ascended masters, the same as Jesus. There are other beings in this universe besides the human beings. Man must admit there is something bigger in this universe, something that is greater than mankind, and there are beings in this universe with more intelligence than man and far more perfect than man. We are surrounded by a universe greater than ourselves. It has law and order within it, and there are beings greater than man who direct its greater manifestations. You must admit that mankind, with all their mistakes and discord and ignorance, are surely not all the beings there are in the universe.

"Mr. Callahan: Now, Saint Germain gave these dictations and then you and Mr. Ballard just copied them down, I mean, just as a stenographer would do?

"Mrs. Ballard: Just as Mr. Dechter [a stenographer] is taking them here. I sat at the table with a pencil and paper and took them down and other ascended beings besides Saint Germain dictated. Jesus himself has been present and dictated several. We have shaken hands with Him. He has held us in His arms. He is real, and I say that before every human being on this earth and all the divine beings of this universe, only because it is true and for no other reason. I bear witness to the reality of these great divine beings, the ascended masters of love, light, and wisdom, who are wholly perfect and have given this instruction to help mankind to become perfect also. I tell you the truth, the whole truth, and nothing but the truth, and because human beings do not know this law or have not understood how to come into the presence of the ascended masters, does not take them out of the universe nor make this law an untruth, nor we, falsifiers. They instructed us to get this instruction in printed form where humanity could have it for their own perusal so each one could apply the law explained and prove the truth of this law for each individual. We have never asked anybody to believe us. We have said, 'Here is the law, apply it, and you yourself will be your own proof of its truth and its practical application to help mankind harmonize, this misery and suffering under which they are now suffering.'"

[7] The other California cases show an equal lack of prejudice. People v. Shannon, 203 Cal. 139, 263 P. 522, man convicted of murder by a jury of men;.

decision of that supreme court is that that court considers that the exclusion of women from the jury lists may be prejudicial. If that be true in any case, it well may be true of the trial of the Ballards.

However, had the California courts held that no one could possibly be prejudiced by the intentional exclusion of women from the jury, it would in no way be binding on the federal district court. The dictum to the contrary of the district court in the earlier Ballard case is not supported by the statute upon which it relies. The jury provisions of the controlling federal statutes [8] are solely concerned with the states' "qualifications" for jurors, here California. They nowhere require or justify the purposeful *exclusion* of half the persons so "qualified" from the jury lists because a state court so holds.

It is significant, however that in § 412 Congress recognizes a prejudice other than of race as making a jury partial. That section requires that the clerk shall be of a different political party from the jury commissioner. Could it be said that a prominent party politician indicted for a violation of the election laws had an impartial jury within the Sixth Amendment if the clerk and commissioner, though of opposite party affiliations, purposefully connived to exclude from the jury lists all members of the party of the accused man? Would such an exclusion of working men, say of the I.W.W., and the listing of jurors solely of business men, give an impartial jury for the trial of a working man on a charge of attempting to wreck a passenger train during a strike against the railway? Cf. Walker v. United States, 8 Cir., 93 F.2d 383, 391; Mamaux v. United States, 6 Cir., 264 F. 816, 819.

In response to the inquiry of the Supreme Court for our views on the defense of exclusion of women from the grand and petit juries in the indictments and trials of a woman and her son, with evidence showing him to be under her influence, charged with misrepresentation regarding their religious beliefs, it is my view that the defense is valid and that the judgment of conviction should be reversed. Though not necessary in a case of such likely prejudices, I am also in accord with what is stated and held at pages 861 and 862 of United States v. Roemig, D.C., 52 F.Supp. 857, the only federal case cited discussing and relying on Glasser v. United States.

(C) 1. *Since, because men are religiously free they are not free to prove as facts their religious experiences, it is a denial of their religious freedom and of due defensive process to charge them with a crime, of which the essence is a misrep-*

---

People v. Manuel, 41 Cal.App. 153, 182 P. 306, woman convicted of forgery by a jury of women, "in the absence of such showing" "that her substantial rights were in the slightest degree prejudiced." Cf. United States v. Pelly, 7 Cir., 132 F. 2d 170, 180, (decided since but ignoring Glasser v. United States), men convicted of violation of federal sedition law by jury of men where "no prejudice to defendants' cause was shown * * * as might readily exist where all persons of defendants' * * * creed were intentionally excluded." Wuichet v. United States, 6 Cir., 8 F.2d 561, 563, man convicted of stock selling fraud by jury of men and no showing of "prejudice to his rights."

[8] (28 U.S.C.A.) "Section 411. (Judicial Code, section 275.) Jurors, Qualifications and Exemptions. Jurors to serve in the courts of the United States, in each State respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such State may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned."

"§ 412. (Judicial Code, section 276, amended.) Same; Manner of Drawing. All such jurors, grand and petit, including those summoned during the session of the court, shall be publicly drawn from a box containing, at the time of each drawing, the names of not less than three hundred persons, possessing the qualifications prescribed in the section last preceding, which names shall have been placed therein by the clerk of such court, or a duly qualified deputy clerk, and a commissioner, to be appointed by the judge thereof, or by the judge senior in commission in districts having more than one judge, which commissioner shall be a citizen of good standing, residing in the district in which such court is held, and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk, or a duly qualified deputy clerk then acting, may belong, the clerk, or a duly qualified deputy clerk, and said commissioner each to place one name in said box alternately, without reference to party affiliations un-

*resentation of their belief in the facts of such experiences.*

*2. Congress did not intend the mail fraud statute, in effect, to license the clever swindler, who may represent to the trusting his participation in supernatural happenings, and nevertheless keep his loot, by refraining from stating his want of belief that they had occurred.*

The Ballards demurred to each count of the indictment on the ground that "said indictment does not state an offense in that on the face of said indictment, and each and every count thereof, it appears that the facts upon which the conviction will be sought are truly statements of opinion or of religious belief, and which are not subject to disproof under the Constitution of the United States and of the law of the land."

The validity of that demurrer must be determined in the light of the holding of the Supreme Court that, if one be charged with using the mails to defraud by false representations of one's religious experiences, he may not in his defense prove the experiences to have occurred.

It is my view that the First Amendment, so denying a man the most potent proof of his innocence, is violated by the indictment in this case. An interpretation holding the indictment valid would convert the First Amendment into a torturing instrument, cruelly hamstringing an innocent accused in his attempt to escape from the legal meshes woven by a religiously antagonistic grand jury.

It is also my view that Congress did not intend to create an offense in which not only is the innocent accused so mangled in his defense, but also the government is denied the right to prove the represented happenings were venal and cruelly deceiving falsehoods.

In the judicial construction of statutes, here those for the fraudulent use of the mails, Congress is presumed charged with knowledge of our constitutional law on the dates of the statutes' enactments, though later expressed by the Supreme Court. To reach the view that Congress has not created the offense described in the indictment there are here considered the then prospective analogous cases and the make-up of federal juries, necessarily in the view of Congress in enacting the legislation.

*1. The indictment under the Supreme Court's decision, hamstrings the innocent.*

On every American jury there may be expected jurors of the Fundamentalist Protestants, High Episcopalians and Catholics who, with complete devotion and reverence, profoundly believe in such miracles; all of them of the Resurrection of Jesus after death and his physical living presence in fact in space, to be physically touched and physically heard; many of them of the physical presence of the miraculously placed stigmata on the body of St. Francis, for whom the writer's native city was named, stigmata physically there by an extra-material causation but measurable by calipers as to depth and size; and of the miracles of Lourdes and of innumerable other saints.[9] To many of them the wine that flowed from the water jars from which Jesus served the wedding feasters at Cana was as from the vine and potable and actually consumed by both believers and unbelievers.

To such religious these happenings are no mere projections of emotional excitation. They are not the "fanciful conjectures" of Borden's Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281. They happen in fact in space and time. To the many millions of such believers, it would impugn the integrity of their clergymen and priests, who preach the truth of such happenings, to hold that they have not frequently occurred in recent and past religious history or that they are unlikely to occur tomorrow. Such religious have no sympathy with a cleric's ironic remark that "It takes a miracle to prove a miracle." To them they are provable as any fact is proved.

The writer prays that his respect for his neighbors' and friends' belief in the appearance of such spiritual supernatural beings is as profound as is theirs. If the writer were not so minded, the First Amendment would compel at least a formal respect, even now that such religious, to escape the penitentiary, are denied the

---

til the whole number required shall be placed therein."

[9] Holweck's Biographical Dictionary of the Saints lists approximately 25,000 who have been recognized as saints in various faiths. The Catholic Encyclopedia (1913 ed.) states in Volume II in the article Beatification and Canonization that miraculous experiences of the person sought to be canonized are among the essential prerequisites.

right to prove, in a court of law, the truth of such experiences.

Others almost certain to be on the jury are the religionists who also believe that man is an individual spirit with complete moral freedom, though abiding in a world of unbroken physical causation. Though questioning any miraculous break in the material causal chain, they also believe that the moral power of self-denial, the purpose of service to other spirits and to causes social and political in the alleviation of suffering and in the creation of freedom from want and of aesthetic beauty, are not mere evolutional rearrangements of primordial gases.

Also on the jury well may be the agnostic and the pure materialists who believe that even this inadequately composed opinion, including its punctuation and capitalization, was framed in the pre-stellar start of the material causal chain.

From some of the last two classes of jurors, the following offered defense to a charge of the use of the mails to defraud, not unlike many miracles of the scores of thousands established as facts in the canonical procedure, would be met by the statement, in the common parlance of the jury, "Maybe so, but show me."

The congregation is assembled for a mass in the ancient cathedral at Quebec. The cardinal is there, and in the congregation are seated, on the central aisle, two American bishops, one a Baptist, the other a Methodist. Seated across the aisle is a young carpenter of German descent. He is the product of a Canadian English-speaking school, but is thinking with pride of the dominating power of the German people, of the destruction of Rotterdam and of Lidice.

Suddenly, in the empty aisle, there stands in the flesh another carpenter. He is not like anyone seated nearby, for he is clad in the working clothes of the carpenter's craft in Judea of some nineteen centuries ago. He is not the projection of either of the bishop's minds, for they happened to be thinking very calmly of their families at home, as were most of the plain people who, with the cardinal and the bishops, witnessed the miraculous presence of the visitor. Perhaps an agnostic psychiatrist would say he was a projection of the cardinal's mind, for he was praying for his visitor's presence and guidance. However, none in the congregation was under an emotional hysteria of impassioned mass psychological appeal, for the services had not been begun and the old cathedral was a homely and intimate edifice familiar to them since their infancy.

The cardinal, the two bishops and some twenty of the French Canadians who understood English heard and are willing to testify to the presence of the Judean and the following happenings: The Canadian carpenter said, "You here! I did not believe, but those scars in your hands come from swinging no adz. What would you have me do?" To which the other replied, "My son, what you have been thinking of the glory of the brutal power of the strong over the weak is among the deepest of sins. Pray you may be forgiven and if you of your own free will truly believe, a greater power will come to you to speak the truth. In response to your preaching to other such sinners you will find the repentant sending you generous funds which you will spend for the help of other victims of force and greed." Thereupon the two carpenters, side by side, walked through the aisle and out of the cathedral.

Later there is an indictment against the Canadian for use of the mails to defraud, returned by a United States grand jury largely influenced by a clan of Americans who are oppressing the weak of a darker race, whom they regard as not an integral part of a white protestant Christiandom. The accused has aroused hostility for his condemnation of their oppression. His principal appeal is the narration of the happenings in the cathedral in Quebec. He has asked money, in mailed letters, for their education and the response has been generous. He founds a great school, having an unusual chartered purpose—the employment of higher paid teachers and longer schooling for persons with the transmitted inferiority complex of the recently enslaved, than for their neighbors of free ancestors.

The executive officer of the Society of White Christians, whom the accused has denounced, testifies for the prosecution, "That carpenter was doing a job on my house and he told me that he did not believe that any of these happenings occurred." The carpenter takes the stand, denies this, and testifies that he believes what he preached of the conversations with the Judean carpenter. The judge has difficulty in suppressing the derisive laughter of the court room.

956

Thereupon, in the excused absence of the jury, the defense offers to prove by the testimony of the cardinal, of the two bishops and of twenty others in the cathedral's congregation, that what the accused carpenter has said of his belief concerning what he saw and heard, they actually had seen and heard. The government cites United States v. Ballard, the court refuses the admission of the evidence, holding that while the carpenter was free to preach of these happenings, the mason Washington, the Catholic Carroll and other founding fathers decided that it would be a denial of his religious freedom if he prove to be facts the happenings which he is charged with misrepresenting. The verdict of guilty follows.

*2. Such an indictment with the law as construed by the Supreme Court, in effect, licenses the clever swindler.*

It may be argued that Congress has so sanctified the mails that it has concluded it is better that one saint be convicted than a hundred sinners escape. The answer is clear. It is not true that such a rule would procure the conviction of the hundred sinners. Indeed, since the disproof of such claimed supernatural experiences is denied, the door is opened to the safe robbery of the trusting and susceptible.

A personable confidence shark may fabricate just such a scene in a cathedral he has visited. He knows that he cannot be compelled to take the stand and be subjected to cross-examination as to his belief. He seeks the death and probate records for the estates of recently deceased husbands leaving insurance or a small property to sustain their wives and children—a long established source of such victims—and then selects those widows who are emotionally susceptible. He gains an emotional control by telling them of his belief in the happenings in the cathedral and takes over their insurance or other moneys with promises, just as charged to the Ballards, that he will give them the power to care for their children and bring them through to maturity in health and strength.

The widows have, for a time, comfort from the pretended celestial guidance; but the hunger and distress of their children convince them that they did not get what they paid for. He has sent a letter through the mails and is indicted.

However, having read the Ballard decision, he never has intimated to anyone that he has not believed any of his representations of the happenings in the cathedral. In the absence of such evidence of want of belief, the prosecution offers as witnesses the cardinal, the two bishops, and the twenty other present in the cathedral on the occasion described by the accused, to testify that the claimed happenings did not occur. The defense cites United States v. Ballard, the testimony is excluded, and, since there is no evidence that the accused did not believe to be untrue what he had represented to have occurred, the jury is instructed to acquit.

It is my view that Congress, having imputed knowledge of the Supreme Court's decision, could not have intended to create in the mail fraud legislation a crime in which on the one hand the accused is denied such potent evidence of innocence and on the other the clever confidence man finds what is tantamount to a license to defraud the trusting.

The demurrer should have been sustained and the motion to quash on the infirmity of the indictment should have been granted.