ÆTNA LIFE INS. CO. OF HARTFORD, CONN., v. KELLEY.

NEW AMSTERDAM CASUALTY CO. v. SAME.

Nos. 9823, 9824.

Circuit Court of Appeals, Eighth Circuit. April 17, 1934.

590

John G. Madden, of Kansas City, Mo. (James E. Nugent, James E. Burke, Morrison, Nugent, Wylder & Berger, and Madden, Freeman & Madden, all of Kansas City, Mo., on the brief), for appellants.

Frank W. McAllister, of Kansas City, Mo. (James W. Broaddus, John B. Pew, and McAllister, Humphrey, Pew & Broaddus, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

In November, 1927, and in July, 1928, Edward D. Kelley obtained accident policies from appellants New Amsterdam Casualty Company and Ætna Life Insurance Company respectively. Appellee, widow of the insured, was named as beneficiary in these policies. The principal sum in the policy issued by the New Amsterdam Casualty Company was $15,000, and the policy insured against loss—

"Resulting Solely from Bodily Injuries, effected directly and independently of all other causes, through accidental means (excluding suicide, sane or insane, or any attempt thereat, sane or insane), as specified in the following schedules, respectively, subject to the provisions and limitations hereinafter contained."

The particular schedules referred to with which we are mainly concerned are part A which provides that "if such injuries shall wholly and continuously disable the insured from the date of accident from performing any and every kind of duty pertaining to his occupation, and during the period of such continuous disability, but within two hundred weeks from date of accident, shall result independently and exclusively of all other causes in any one of the losses enumerated in this part"—in this case, loss of life—for which the full principal sum of $15,000 should be paid; and part C, which provides that "if such injuries are sustained while a passenger in or on a public conveyance provided by a common carrier for passenger service (including the platform, steps, or running board of railway or street railway cars); * * * the company will pay double the amount otherwise payable under Part A or B of this policy." Part B has to do with certain weekly indemnities for total or partial loss of time as the result of injuries sustained by accident independently and exclusively of all other causes.

The policy issued by the Ætna Company was for the same principal sum and insured against loss "resulting directly and independently of all other causes from bodily injuries effected during the term of this policy solely through accidental means." For loss of life

the principal sum was payable, which should be doubled if the injuries sustained by the insured should be caused "while a passenger in or upon a public conveyance provided by a common carrier for passenger service (including the platform, steps or running board of railway or street railway cars."

Edward D. Kelley, the insured, was engaged in the real estate business in Kansas City, Mo. April 10, 1929, he was a passenger upon a Wabash railway train with Carrollton, Mo., as his destination. He had taken a seat upon the rear platform of a coach. It is testified that he arose to permit another passenger to re-enter the car, and, in doing so, slipped or stumbled and fell, over the railing surrounding the platform, upon the roadbed below. He was taken to Carrollton and placed in a hospital under the care of a physician. He remained at Carrollton under treatment for approximately sixty days and then went to Excelsior Springs, Mo., where he lived until his death. He had what is termed a "stroke" February 14, 1931. This was followed by cerebral hemorrhages and he died February 26, 1931.

Dr. Lowrey, a physician who examined him June 10, 1929, upon his arrival in Excelsior Springs two months after the accident, testifies that he found a scar as evidence of fracture of the skull, a Colle's fracture of the wrist, and a Pott's fracture of the larger bone of the right ankle. He also found evidences of other strains and bruises of a minor nature.

For some time after the accident the companies paid disability indemnities under provisions of the policies granting such indemnities for total or partial loss of time as a result of accident. During the last year before the death of the insured the continuance of his disability within the terms of the policies were controverted. After his death a post mortem operation was performed by pathologists, in the presence of several physicians, two of whom represented the company and two the beneficiary in the policies. They found that death was caused by hemorrhage into the brain with a severe arteriosclerosis of the brain vessels. The autopsy revealed a general condition of arteriosclerosis, or hardening of the arteries, particularly in a marked degree in all basal arteries and vessels of the brain, also of the aorta and visceral arteries. There were also sclerotic changes in the kidneys, together with hypertrophy of the heart. The large vessels of the neck and the abdominal aorta showed typical changes of arteriosclerosis.

Dr. Frank Hall, a pathologist, who was present at the autopsy and signed with others the report of the post mortem, was introduced as a witness for appellee. In the course of his cross-examination he testified as follows:

"Q. The length of time during which that hemorrhage operated, as I recall, was about, in your opinion, as much as two or three weeks? A. At least that.

"Q. What I mean is, so there will be no confusion, you are not claiming that this was any hemorrhage that occurred at the time of the accident? A. No sir.

"Q. This was a hemorrhage, now that resulted from arteriosclerosis, was it not? A. Yes, sir. It was arterial degeneration.

"Q. Yes. So that the cause of death, the immediate cause of death was arteriosclerosis producing a cerebral hemorrhage? A. Yes, sir.

"Q. And that is a disease, isn't it, Doctor? A. That is a disease."

Respecting the nature of arteriosclerosis the same witness said:

"Q. Doctor, when you have a condition of arteriosclerosis present in one part of the body you normally expect to find indications of it in another, don't you? A. There practically always is an associate arteriosclerosis in one part of the body, though it may be greater at one part than at another; is nearly always more or less generalized in its distribution.

"Q. It is a systemic degenerative disease, is it not? A. Yes, sir.

"Q. By systemic I mean a general disease affecting all parts of the body? A. Yes, sir.

"Q. And by degenerative I mean that it causes a degeneration of the arterial walls? A. Yes, sir; it does."

It thus appears that arteriosclerosis, or hardening of the arteries, is a degenerative disease, insidious in onset, difficult of detection in earlier stages, and progressive in nature. It appears that infections of various kinds from which germs may be carried to the blood vessel walls may cause degenerative disorders of this kind.

Dr. Kuhn, a witness for appellants, testified thus upon this matter:

"A. Well, we don't know exactly what produces abnormal hardening of the arteries. We regard it as a constitutional change incident to increasing age, possibly due to some altered chemistry of the body; possibly due to certain toxins or poisons or something that are liberated incident to that.

"Q. It is just a natural thing? A. I wouldn't call, necessarily, constitutional conditions natural because a great many constitutional conditions are unnatural.

"Q. But constitutional conditions are distinguished from things that are changed by a microbe or infection? A. Well, a constitutional condition might be just as serious as an infection condition. For instance, diabetes is a constitutional condition. It is not due to infection in the slightest.

"Q. But infection doesn't cause the beginning of the hardening of the arteries? A. Well, I am not so sure but what chronic infection is a very important factor in hardening of the arteries."

These actions were filed originally in the circuit court for Jackson county, Mo., and were removed because of diversity of citizenship to the district court for the Western District of Missouri, where they were consolidated for trial. That trial resulted in verdicts and judgments for appellee.

The main specifications of error upon which appellants rely as disclosed in the briefs and arguments of counsel are:

1. That the court erred in overruling motions for directed verdicts because the evidence showed that appellee's decedent died from disease, which precluded recovery under the terms of the policies.

2. That the court erred in charging the jury that the expert testimony was advisory merely in so far as they state in their testimony only their opinions.

3. That the court erred in admitting lay testimony "to the effect that prior to the accident the decedent appeared to be 'well' and 'sick' thereafter."

4. That the arguments of counsel for appellee were improper, inflammatory, and prejudicial, and constituted an appeal to the passions and prejudices of the jury; that the court erred in overruling objections thereto and in failing to restrict such arguments to their proper scope.

These specifications will first be considered.

1. In view of the findings at the autopsy that the death of the insured was caused by a cerebral hemorrhage due to a severe arteriosclerosis of the brain vessels, a diseased arterial condition, appellee undertook to establish that, at the time of the accident, the insured was not suffering from arteriosclerosis; that the accident could, and solely did, cause such arteriosclerosis; and that decedent was totally and permanently disabled from the date of the accident, solely as a result of the injuries sustained and independently of all other causes. Appellants, contending that the evidence showed that decedent died from disease, that there was no substantial evidence that the accident was the sole cause of that disease, nor that death resulted, directly and independently of all other causes, from bodily injuries effected solely through accidental means, insist that their motions for directed verdicts should have been sustained. Without in any sense undertaking to pass upon the merits of the case, we are of opinion that there was in the record sufficient to warrant submission to the jury, provided the record is found otherwise to be free from error.

2. At the close of the charge, the court, at the request of counsel for appellee, said:

"Gentlemen of the jury, I charge you as to the testimony of expert witnesses, that in so far as they state in their testimony only their opinions, that testimony is advisory only to the jury. Their statements as to facts, findings of fact, of course, is testimony which is more than advisory merely."

To this an exception was preserved. Previously in the charge the court had made this statement concerning the value of expert testimony:

"There were expert witnesses upon both sides, and in saying this I am not in any way indicating any views for one side or the other—I say this: That what causes a man's death, especially if it is something that is not apparent, if I wanted to know what caused a man's death or wanted information on that subject I would certainly feel that I could rely more upon the views of expert men of science who have given their lives to that subject than I would upon the testimony of others. If I wanted to know something about how crops grow I would ask a farmer. I wouldn't ask a blacksmith. If I wanted to know something about the law I would ask a lawyer, and I would have as many conflicting views, probably, as there are lawyers. If I wanted to know something about the cause of a man's death I think I would ask a man who was an expert in that field and rely upon his testimony. There was testimony on both sides, of course. I think that it is reasonable to say to you: Do not think that merely because a man has devoted his life to the study of a given science that he doesn't know anything about that and somebody else who hasn't devoted his life to a study of that science knows more about it. What I have said to you in that connection, while I think it is

very reasonable, is in no sense binding upon you."

██ The additional charge quoted, given at request of appellee's counsel, took away much of the force of this very proper analysis of expert testimony. Especially was that true as applied to the peculiar nature of the issues involved. As said by the court, the cause of death was not superficially apparent. Arteriosclerosis is insidious in approach and difficult of detection in its earlier stages, as appears from the testimony. It does not disclose itself to the untrained eye in the general physical appearance of the sufferer. Upon the question of whether it was present in decedent at the time of the accident, the views of the medical experts were substantially the only dependable and competent factual testimony upon this point in the case. It is a matter of every day experience and common knowledge, of which this court may take judicial notice, that men die suddenly of this disease, when apparently in normal health. Its existence and the extent of its progress are discoverable only by expert medical examination, and by deductions made possible by training and experience. To allow the jury to treat expert opinion upon this phase of the controversy as advisory merely is substantially to permit it to underestimate the force of the most important factual testimony in the case. Particularly is this true upon the crucial question of whether decedent was suffering from arteriosclerosis at the time of the accident, as disclosed, or not disclosed, by the findings of the autopsy.

██ 3. This leads directly to a consideration of the third specification, to wit, the testimony of a number of lay witnesses that the insured appeared to be well at the time of the accident and sick thereafter. As bearing upon the question of the extent of his disability after the accident, and, perhaps, in some other respects, this testimony was undoubtedly competent; but it could have no substantial probative force upon the question of whether decedent was or was not afflicted with arteriosclerosis at the time that accident occurred. Where a disease is one the existence of which is discoverable only by a skilled physician by the ascertainment of existing symptoms, the question of whether such disease exists is not established by testimony, based only on observation of such person's outward appearance, that he then seemed to be in good health. Scharlach v. Pacific Mutual Life Ins. Co. (C. C. A. 5) 16 F.(2d) 245. The existence of this specific disease was a strictly medical question; the conclusions of laymen upon such an issue are without adequate basis, and, necessarily, mere speculation. United States v. Clapp (C. C. A. 2) 63 F.(2d) 793, 794. Competency of evidence in a civil case in a federal court is determinable by the law of the state where the trial is had. Chicago Fire & Marine Ins. Co. v. Hyde Park Congregational Church (C. C. A. 8) 35 F.(2d) 73.

In Fulton v. Metropolitan Street Railway Company, 125 Mo. App. 239, 102 S. W. 47, evidence of this nature was permitted so that the appearance, pain, and activity of one suffering from an alleged injury might be shown to the jury, where the existence of such pain and suffering, bearing upon the extent of the injury, was disputed. We think the true distinction is thus inferentially and satisfactorily stated in Partello v. Railroad Co., 217 Mo. 645, 117 S. W. 1138, 1140:

"So may a nonexpert give his opinion in a great variety of cases when the facts known to him, and to which he would be competent to testify, would furnish no predicate whatever for the opinion of an expert witness. As a rule, such are confined to questions of identity, and such matters as may be open to the senses, but incapable of exact description. Thus a nonexpert 'may testify that a person appeared to be suffering, was weak and helpless, appeared sick, looked pale or paler than usual, or was declining in health.'"

██ The case, therefore, must be one where the fact in issue is "open to the senses." It is a matter of common knowledge that a layman cannot, by the exercise of mere superficial perception, determine whether this hidden disease may be present in the arteries. Undoubtedly many cases may be found where the testimony of expert witnesses is held to be advisory merely, especially where there is direct proof of facts within the judgment of a nonexpert; and where lay witnesses have been permitted to testify concerning injuries sufficiently apparent to the untrained eye. But the propriety of such a charge and the admission of such testimony must depend upon the issues framed and the nature of the subject-matter involved. The able trial judge, in this case, had a most difficult duty to perform. The charge, and the admission of the testimony complained of, are proper in a great percentage of cases, and may easily have escaped the scrutiny of the court under the circumstances. As the matter was left, too little importance was attached to the expert testimony offered, and, by comparison, too great effect was indirectly given to

594

the lay testimony on a phase of the controversy upon which it could have no substantial probative value. This lay testimony should at least have been expressly restricted to those features of the case, if any, concerning which it was competent.

 4. In the closing arguments by counsel for appellee inflammatory statements were made which were well calculated to arouse prejudice in the minds of the jurors. The physicians and surgeons produced as expert witnesses by appellants were referred to in terms of extreme opprobrium. Receiving, presumably, professional witness fees, they were characterized repeatedly as paid or bought witnesses. Following are some of the expressions used:

"This defense predicated upon medical testimony bought and paid for, speculating away the rights of this little woman."

"These same medical experts giving their opinions in order to try to beat this woman out of the money that she is entitled to."

"These men who never see a man until after he is dead—cut them up, more cruelly than a butcher would a piece of meat on the block—thousands of them—and come in and testify—thank God some of those men never see a man until he is dead. Well for humanity."

"These folks come here with every part of this testimony purchased or paid for."

"These fellows who examined him, these fellows who worked for the insurance company—I am bound to say men on a very commercial basis—men who cut up three or four thousand bodies, become very mechanical, just digging in with a knife, cutting it up, it is bound to have an effect on the disposition of the man as to kindness or cruelty."

"They can smear their conscience over—and $50.00 a guess."

The following language was used with respect to Dr. Koritschoner, one of the pathologists and a native of Austria:

"The first man they put on was this fellow from Austria. I won't pronounce that name. It begins with a 'K.' His native language is German. Been over here a short time. Gentlemen, you must bring in a verdict upon the evidence as you remember it. There isn't a man on this jury that can remember a sentence he said. He talked in stuff—he might just as well have talked German, as far as that is concerned, or Latin or Greek. He rolled off a whole rigamarole that was totally meaningless. That is the idiocy of expert testimony. * * *

"He is the fellow that has cut up twenty thousand people; and he is a young man. He butchers dead bodies.

"Mr. Madden: I object to that as improper, prejudicial and inflammatory argument; entirely unjustified.

"The Court: I think it is as to the last statement.

"Mr. Pew: Yes, sir. I will withdraw it. I used the wrong word. He cuts them up; and he must work fast to cut up twenty thousand in his young life."

Dr. Koritschoner graduated in 1910 from the University of Vienna and has practiced his profession since that date. He came to this country in 1924, and has been pathologist in four of the leading hospitals in Kansas City. Conceding to counsel the right of proper criticism of the testimony of witnesses produced by the opposing side, it is clear that the language here used was extravagant and intemperate, and was calculated to arouse prejudice, and to minimize unduly the crucial testimony offered by appellants upon the main issue in the case. Such language is the more effective when in closing arguments to which the defendant has no opportunity to reply, but the vice is not restricted to such arguments. It is true that counsel for appellants did not object to many of the statements quoted above as illustrating the general nature of the closing arguments. But the failure to take affirmative action is not conclusive. The court should intervene sua sponte when necessary to secure a fair trial. Brown v. Walter (C. C. A. 2) 62 F.(2d) 798; August v. United States (C. C. A. 8) 257 F. 388, 391. In the latter case the ruling was predicated upon the opening argument of the Assistant United States Attorney, to which no objections were made, nor exceptions preserved. Compare Rouse v. Burnham (C. C. A. 10) 51 F.(2d) 709. In New York Central Railroad Company v. Johnson, 279 U. S. 310, 49 S. Ct. 300, 73 L. Ed. 706, the Supreme Court has voiced its condemnation of conduct of counsel calculated improperly to influence the verdict by appeals to passion and prejudice, and holds that the failure of counsel to particularize an exception will not preclude the court from correcting such error.

 It seems clear to us that the limitation of the effect of expert testimony, the resulting comparatively greater effect given to the lay testimony, substantially incompetent upon the question of the existence of arteriosclerosis, and the intemperate remarks of

counsel concerning appellants' expert witnesses, especially when taken together, cast too great a burden upon the defense, and call for a reversal of the judgment. Inasmuch as the case is to be tried again we give consideration to some other specifications.

The error assigned to the nunc pro tunc order, by which the words "and independently of all other causes" were added by interlineation after the word "directly" in the original petition filed against appellant Ætna Life Insurance Company may be disregarded because appellee may cure the defect of omission, if it be one, by amendment in the lower court.

In its original charge to the jury the court made this statement:

"I have said to you just now that if the insured, Mr. Kelley, had arteriosclerosis, the disease known as arteriosclerosis, on the date of the accident, April 10, 1929, that then your verdict must be for the defendant. I have said that to you. I do not mean to say that your verdict must be for the defendant if all you should believe from the evidence is that on April 10, 1929, he had some condition of the arteries, hardening or stiffening of the arteries, which was not the result of a disease and which was not itself a disease, but which was a normal condition of the arteries of a human being of the age which Mr. Kelley had then attained."

At the conclusion of the charge counsel for appellants said:

"In view of the court's charge I ask the court to charge further that if arteriosclerosis was present at the time of this accident it must be regarded as a disease and constitute a complete defense, whether it was caused by age or otherwise, and the fact that arteriosclerosis was caused by age does not prevent it from being a disease within the meaning of your Honor's charge.

"The Court: What I said to the jury was entirely consistent with that request, and I charge the jury in accordance with that request."

There is room for belief that the jury may have been confused by the apparent contradiction in these statements; but this may be clarified at a further trial of the case. The court had already declared that the disease known as arteriosclerosis was undoubtedly the immediate cause of decedent's death. Compare Carpenter v. Connecticut General Life Ins. Co. (C. C. A. 10) 68 F.(2d) 69, 72. As to the effect of the participation of disease in the death of the insured under accident policies of this nature this court has laid down a very salutary and helpful rule in National Masonic Acc. Ass'n v. Shryock (C. C. A.) 73 F. 774, 775:

"The burden of proof was upon the defendant in error to establish the facts that William B. Shryock sustained an accident, and that that accident was the sole cause of his death, independently of all other causes. If Shryock suffered such an accident, and his death was caused by that alone, the association agreed by this certificate to pay the promised indemnity. But if he was affected with a disease or bodily infirmity which caused his death, the association was not liable under this certificate, whether he also suffered an accident or not. If he sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused his death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of this insurance. The death in such a case would not be the result of the accident alone, but it would be caused partly by the disease and partly by the accident, and the contract exempted the association from liability therefor. These propositions have been so lately discussed and affirmed by this court that we content ourselves with their statement." Travelers' Insurance Company v. Melick, 12 C. C. A. 544, 547, 65 F. 178, 181, 27 U. S. App. 547, 27 L. R. A. 629; United States Mut. Acc. Association v. Barry, 131 U. S. 100, 111, 112, 9 S. Ct. 755, 33 L. Ed. 60; Freeman v. Mercantile Mut. Acc. Association, 156 Mass. 351, 353, 30 N. E. 1013, 17 L. R. A. 753; Anderson v. Insurance Co., 27 Scot. L. R. 20, 23; Smith v. Insurance Co., L. R. 5 Exch. 302, 305; Standard Life & Acc. Insurance Co. v. Thomas, 12 Ky. Law Rep. 715; Marble v. City of Worcester, 4 Gray, 395, 397; National Benefit Association v. Grauman, 107 Ind. 288, 290, 7 N. E. 233.

This case has been cited many times with approval.

However, the main issue in this case, and the theory upon which it was tried was whether the disease existed at the time of the accident, or whether it was caused solely and directly by the accident, and independently of all other causes. If the latter is established, by competent testimony, it is our opinion that the death of the insured was a direct result of the accident.

Error is assigned to the admission of certain testimony by Dr. Lowrey for the reason (a) that the opinion of the witness upon the ultimate issue was based in part upon hearsay history, not subjected to the test of facts testified to before the jury, and (b) in response to an allegedly erroneous hypothetical question. We are confident that this matter will be satisfactorily resolved by the trial judge upon presentation in a new trial, and that it is unnecessary to expand this opinion further by an exhaustive analysis of the rules of evidence involved in this specification.

Error is assigned to the exclusion of the report of the autopsy. It appears that the participants in the post mortem were permitted to testify fully as to the condition found, and no prejudice could result generally from the exclusion of the report. Without doubt it would be admissible if necessary to impeach the credibility of a witness.

It results that the judgments below must be reversed and the cases remanded for a new trial in harmony with the views herein expressed. It is so ordered.