**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a Corporation, Plaintiff-Appellant,**

v.

**Billie Irene UNDERWOOD, Defendant-Respondent.**

No. 23630.

Kansas City Court of Appeals. Missouri.

Feb. 4, 1963.

Fred F. Wesner, Wesner, Wesner & Meyer, Sedalia, for plaintiff-appellant.

Gayles R. Pine, Pine, Welling, Jones & Lockard, Warrensburg, for defendant-respondent.

BROADDUS, Presiding Judge.

This action was originally instituted by plaintiff-appellant as a declaratory judgment proceeding seeking to determine its liability or otherwise to defendant-respondent as the widow of Edward Leon Underwood the named insured in an insuring contract which, among other things, provided for a death indemnity to be paid in event of death of insured which shall result directly and independently of all other causes from bodily injury caused by accident and sustained by the insured while occupying or through being struck by an automobile provided the death shall occur within ninety days from the date of such accident or within one year after the date of the accident and during a period of continuous total disability.

Following institution of the declaratory judgment action defendant-respondent, Billie Irene Underwood, filed as a responsive pleading to the declaratory judgment action her motion to dismiss, together with alternative answer and counterclaim cause of action pleading the existence of the insuring agreement, its terms and that as the surviving widow of the deceased insured she was entitled to recover a death indemnity amount in the sum of $5000.

On being presented to the trial court, defendant-respondent's motion to dismiss the declaratory judgment action was denied and following which and by leave of court plaintiff-appellant's original action seeking a declaratory judgment was dismissed without prejudice and plaintiff-appellant filed its reply and joined issue with defendant-respondent on the counterclaim cause of action.

Trial of the issues as thus joined resulted in a verdict and judgment in favor of defendant-respondent on her counterclaim and against plaintiff-appellant in the sum of $5000, together with interest thereon in the sum of $431.25.

By her counterclaim respondent pleaded, among other things, that she is the surviving widow of Edward Leon Underwood and that on or about December 14, 1959, appellant issued its automobile insurance policy to the decedent, her husband, under the name of Leon E. Underwood and that by the terms of said policy, which was at all times in full force and effect, appellant agreed to pay to her as the surviving widow, the sum of $5000 in the event of the death of the insured proximately caused from bodily injuries sustained by said insured by accident or automobile collision, while the insured was occupying an automobile, " * * * a copy of said policy being attached hereto and made a part hereof and all relative terms and conditions of said policy being incorporated herein." The counterclaim alleges that on the 2nd day of February, 1960 (should read 29th day of January 1960), the deceased was involved in a motor vehicle collision and as a result thereof sustained bodily injuries resulting directly in and proximately causing his death on February 17, 1960, and within ninety days from the date of accident and injury.

All as a result of which and by the terms and conditions in the policy, she alleged she was entitled to recover from appellant the sum of $5000 with interest, penalties and attorneys' fees.

Appellant's reply to the counterclaim admitted that respondent is the surviving widow of Edward Leon Underwood; and that on December 14, 1959, it issued the automobile insurance policy described in respondent's counterclaim to and in the name of Leon E. Underwood and that Leon E. Underwood, is the same person as Edward Leon Underwood, now deceased. The reply then denied all of the remaining allegations of the counterclaim.

To sustain the issues on her counterclaim respondent first produced as a witness Mrs. Mary Catherine Brown who testified that she was the Record Librarian at the Osteopathic Hospital, Kansas City, Missouri, and that as such she had with her and produced hospital records pertaining to hospitalization and treatment of one Edward Leon Underwood.

The hospital records covering the hospitalization of Mr. Underwood, beginning on February 16, 1960, and ending on the following day, February 17, 1960, were marked and received in evidence as respondent's Exhibit No. 1. Exhibit No. 1 consists of thirty-five separate pages and smaller sheets of paper.

On cross-examination this witness was asked and testified regarding various doctors identified with the Osteopathic Hospital in Kansas City who attended the deceased.

The respondent called as a witness, Mrs. Nel Maness, who testified she was the Medical Record Clerk at the Holden Hospital, Holden, Missouri. The witness produced hospital records, x-ray plates and instruments which were marked as respondent's Exhibits No. 3 through and to Exhibit No. 16 inclusive.

Exhibit No. 14 was identified by the witness as being the original copy of the hospital record covering the hospitalization of the deceased in the Holden Hospital from the date of his admission on February 2, 1960, until he was removed therefrom on February 16, 1960, by ambulance to the Osteopathic Hospital in Kansas City.

Respondent also offered in evidence Exhibit No. 17, a Missouri Division of Health Standard Certificate of Death.

This Exhibit shows, among other things, the name of the deceased, Edward Leon Underwood, white male, married, date of birth 1–2–37, age 23, date of death, February 17, 1960, cause of death:

"PART I—DEATH WAS CAUSED BY: * * *

"Immediate cause (a) Myocardial failure

"Due to (b) cerebral anoxia.
"Due to (c) cardiac arrest.

"PART II—OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO THE TERMINAL DISEASE CONDITION GIVEN IN PART I (a):

"Patient was being operated upon for back condition originating from auto accident occurring 1–29–60."

We will refer later on to these Exhibits.

The respondent, Billie Irene Underwood, testified she is the surviving widow of Leon Underwood, his correct and full name was Edward Leon. During January 1960, he was employed in Kansas City. Their home was in Leeton, Missouri, and Mr. Underwood drove back and forth coming home on Wednesday and Friday nights and was home over the weekend. He was involved in an automobile collision on January 29, 1960. His health prior to January 29, 1960, was good and she never knew of him having any kind of heart trouble. He owned and was driving a Chevrolet automobile on Friday, January 29, and that evening around eight or nine o'clock he arrived home. His back was hurting so he didn't sleep much. When he did (sleep) he was on the heat pad. He returned to work on Monday but he came home that afternoon and saw a doctor. After that he went to the Holden Hospital on February 2,

1960 and remained in that hospital as a patient until February 16, 1960, when he was removed to the Osteopathic Hospital in Kansas City. He died on the following day, February 17, 1960.

Mrs. Gladys Irene Underwood testified that she was the mother of Edward Leon Underwood; that prior to January 29, 1960, Edward Leon was in good health and she never knew of him having any heart trouble.

Respondent's Exhibit 14 constituting the hospital and treatment records of the deceased for his back injury while a patient in the Holden Hospital reflects: That deceased was admitted to the hospital on February 2, 1960, as shown by the history sheet and physical examination, chief complaint being pain in the lumbar and lower dorsal area, reciting that on January 29, 1960, deceased was involved in an automobile collision while driving his automobile, at which time deceased noticed pain in his back which became more intense rendering him unable to work; his condition was diagnosed by the examining physician as traumatic unstable lower back, possible ruptured intervertebral disc. Progress notes of said Exhibit reflect that deceased was placed in traction on the date of admittance to the hospital; the back pain continued and on February 11, 1960, the doctors decided to do spinal fusion on deceased; on February 15, 1960, surgery was performed on deceased for laminectomy between L5 and S1 and for spinal fusion; while in surgery deceased suffered a cardiac arrest; his chest was opened and his heart massaged and was brought back to beating in approximately three minutes after the heart and breathing had stopped as shown by the records made by Dr. D. Cunningham; page 9 of said Exhibit reflects that Dr. W. R. Slater on the same day of the operation noted deceased was in a semi-comatosed condition.

Immediately before the operation, deceased's heart was normal to auscultation, his lungs normal to auscultation; the pur-

pose of the operation was excision of ruptured intervertebral disc; the operation was hemilaminectomy L5, excision of herniated intervertebral disc; surgery began at 2:55 P.M. on February 15, 1960, and ended at 4:50 P.M.; at 4:27 P.M., during surgery deceased suddenly became cyanotic, pulse became weak and then was not palpable; he was in a prone position at that time. He was then turned on his back and chest cavity opened and cardiac massage started. Heart action and respiration were restored in approximately two to three minutes after arrest was noted; as shown by statements of Dr. J. P. Watt, Anesthetist.

Preoperative diagnosis of deceased's injury was a protruding lumbar disc and lumbar instability, postoperative diagnosis of deceased's injury was herniated lumbar disc and lumbar instability. The disc was removed and the spine was prepared for graft by Dr. W. R. Slater who made the diagnosis and performed the surgery.

Deceased never regained consciousness after the operation and had convulsions until his removal from the Holden Hospital on the morning of the following day, as shown by the nurses' notes.

The death certificate of insured was prepared and signed by Dr. Wesley R. Slater, his attending physician.

At the close of respondent's evidence appellant offered its motion for a directed verdict, which was denied. Thereupon appellant declined to offer any testimony and elected to stand upon said motion. Appellant now contends that the trial court erred in refusing to sustain the motion.

Briefly, the facts of the case are: Deceased was perfectly healthy and a young and able bodied man immediately prior to January 29, 1960. On that date he was involved in an automobile accident. He sustained an injury to his back causing him pain which became progressively worse necessitating medical care and hospital treatment. His back injury was a ruptured intervertebral disc of his spine. Deceased

was confined to a hospital for treatment of his back injury from February 2, 1960, to February 17, 1960, when he died. Surgery was performed on the injured portion of deceased's back on February 15, 1960, and the ruptured disc was removed. In the course of preparation for fusion of his injured back and while in surgery, deceased's heart stopped beating. In other words, he sustained a "cardiac arrest" as mentioned in the death certificate. Deceased never regained consciousness after surgery on his back. He had periodic convulsions and his death ensued within two days following surgery.

■ Surgery to correct and alleviate injury does not break the causal connection between the injury and death of an insured. As stated in 29A Am.Jur. Insurance, Sect. 1219, page 362:

"* * * Thus, death caused by treatment by a reputable member of the medical profession of an injury covered by a policy insuring against death caused by 'external, violent, and accidental means', where such treatment is regular, ordinary, and in accordance with the teaching of his profession, is one of the possibilities within the contemplation of the parties to the policy, and where the death results solely from such injury and the treatment thereof recovery can be had. * * * A surgical operation which is proper treatment for a bodily injury sustained by accident or accidental means does not break the causal connection between such means and the death of the insured * * *."

■ We are of the opinion that under the holding of our Supreme Court in the case of Wheeler v. Fidelity & Casualty Co., 298 Mo. 619, 251 S.W. 924, the respondent made a submissible case and the trial court committed no error in overruling appellant's motion for a directed verdict. Among the cases the court cites in support of its ruling in the Wheeler case

is that of Sharp v. Missouri Pac. Railroad, 213 Mo. 517, 111 S.W. 1154, wherein appears the following graphic language by the late Judge Lamm:

"The issues presented on this testimony were submitted to the jury by instructions not criticised by learned counsel. It was for the jury to reconcile the conflict in the testimony, if possible, not this court. A trial is not to a judge alone, nor to a jury alone, but to a judge and jury. We cannot say on this record that to attribute the death of Sharp to his injury is a mere guess. If a man, well to-day, is badly injured, and from that time on sickens (with symptoms referable to his injury), and, languishing, finally dies, a disagreement among doctors as to the name of the disease on him at the moment of dissolution does not create a condition from which it can be said that a verdict one way or the other is merely guess work—a wild goose chase into the field of chance and conjecture. Defendant's theory necessarily has its root in the notion that plaintiff's evidence was unworthy of belief; for, if there had been no physicians testifying as experts and the jury had been without medical advice, yet plaintiff's lay evidence showed a cause for Sharp's pain and suffering, and his visible approach to the grave in the steps he took, commencing at the place and time of his injury and ending there, are rational deductions within the right of a jury in applying common sense to facts. The expert medical testimony was merely advisory, and, because the advice given to the jury by the opinions of the doctors differed, that presents no case for our interference. The mysteries of death are inscrutable and baffle complete scientific solution by mortal man. The sting of death is hidden. The best that can be done is to establish a chain of causation—to show a cause (an injury) from which an effect (death) might reasonably follow. We know, without doctors' advice, that men have been killed by falls. We know, too, that death may follow weeks of pain and suffering from inward hurts, having their origin in such a fall. This seems to be such a case, provided, of course, the jury believed plaintiff's testimony. The burden was on the jury under their oaths to hear, weigh, and decide. It was their prerogative to believe or disbelieve. Admitting we have the power, yet we have no disposition to interfere with their verdict."

And in the instant case, whether or not the injury insured received in the automobile collision on January 29, 1960, was the active, direct and proximate cause of his death occurring 19 days later was for the jury to say.

The judgment is affirmed. All concur.