**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Appellant,**

v.

**Billy Irene UNDERWOOD, Respondent.**

No. 50149.

Supreme Court of Missouri,

In Banc.

April 13, 1964.

Fred F. Wesner, and Wesner, Wesner & Meyer, Sedalia, for plaintiff-appellant.

Gayles R. Pine, and Pine, Welling & Jones, Warrensburg, for respondent.

EAGER, Chief Justice.

The original appeal in this case was decided by the Kansas City Court of Appeals, as shown by its opinion reported Mo.App., at 365 S.W.2d 761. This Court sustained an application for transfer.

Plaintiff-appellant issued to Edward Leon Underwood an "Automobile Policy" which contained provisions for indemnity of $5,-000 for death by accident, as more particularly specified. He died on February 17, 1960, and claim was made for such indemnity. Thereupon the insurer filed a declaratory judgment suit and Mrs. Underwood, as beneficiary, filed a counterclaim for the proceeds of the policy with interest, damages, and attorneys' fees. The declaratory judgment action was subsequently dismissed without prejudice, and the case proceeded upon the counterclaim and a reply. Defendant recovered a verdict and judgment for the face amount of the indemnity, with interest, being a total of $5,425. In essence,

this is a suit upon the contract with the parties plaintiff and defendant reversed. The pleadings were sufficient to raise all the issues which will be discussed. The policy was admittedly in force at the time of the death.

On Friday, January 29, 1960, Mr. Underwood was involved in what appeared to be a minor automobile accident in Jackson County, where he was then working. Another car slid into his car on an icy street inflicting some damage to the left side of his car. He stated at the time that he was not injured, although the hospital record of four days later stated that he noticed a pain in his back at the time; in any event he drove home. He and his wife were then living at Leeton, and he commuted home about twice a week. His wife testified that on his arrival home he was "real white" and was not "feeling well"; that he stayed at home that weekend, and his back hurt so badly that he did not sleep much. He went to work on Monday, but returned home during the afternoon and stated that he had been to see a doctor. On February 2, 1960, he entered the Holden Hospital with a provisional diagnosis of "unstable low back" and a possible rupture of an intervertebral disc; the final diagnosis was the same except that it corroborated the existence of a herniated lumbar disc. He was placed in traction, but his back pain continued. On February 15, 1960, he was taken to surgery for a "par-

tial Hemi-laminectomy with Removal of Disc at L5 and a Spinal Fusion." This, as we understand, meant the removal of a ruptured disc between the last lumbar vertebrae and the sacrum and the fusing of that area with a bone graft. Apparently both intravenous and inhalant anesthetics were used, but in any event the patient was under general anesthetics. The surgeon, his assistant and the anesthetist were osteopathic physicians. The ruptured disc, or the necessary portion of it, was removed and the locale was being prepared for the bone graft or fusion when the patient suffered a "cardiac arrest." Radical restorative measures were instituted; the patient's chest was opened surgically and the heart massaged; within 2–3 minutes the heart beat was restored. The chest was closed, the surgical site in the back was closed and restorative medications administered. The patient developed a form of convulsions, apparently mild, and he remained in a comatose or semi-comatose condition. On February 16 he was transferred to the Kansas City Osteopathic Hospital, but his condition gradually deteriorated and he died on the next day. He never really regained consciousness.

Two separate death certificates appear in our record, made by two different physicians. The one which the parties seem to accept as the official one states "Cause of Death" as follows:

"Part 1.                                    Death was caused by:
                                              Immediate cause (a)   Myocardial Failure
Conditions, if any, which gave               Due to (b)   Cerebral anoxia
rise to above cause (a), stating             Due to (c)   Cardiac Arrest.
the underlying cause last.

Part 11   Other significant conditions contributing to death but not related to the terminal disease condition given in Part 1(a) Pt was being operated upon for back condition originating from auto accident – occurring – 1–29–60."

An autopsy report was also in evidence; this showed, among other diagnoses: severe interpulmonary hemorrhage, pulmonary edema, broncho-pneumonia, hemothorax, compression atelectasis, cerebral congestion and pulmonary thrombosis. It seems obvi-

ous that most of these were lung complications. This report further stated: "From the standpoint of pathology death was due to anoxia when the oxygen cycle was interrupted in the lungs." The "Final Diagnosis and Complications" stated on the record of the hospital where the insured expired, were: "(1) Acute myocardial and circulatory failure and, (2) Cerebral anoxia with cortical damage due to cardiac arrest 2–15–60 at Holden, Missouri. COMPLICATIONS: (1) Interstitial emphysema, (2) Partial atelectasis of upper lung fields, (3) Pneumothorax." Upon entry into the first hospital on February 2, 1960, it was noted that the rate, rhythm and intensity of the patient's heart were regular, no murmurs, no rales, and normal area of dullness on percussion. This appears to have been a routine examination. From an X-ray a diagnosis of chronic bronchitis was made. Mrs. Underwood testified that her husband "was in good health" and that she had never known of his having "heart trouble" of any kind. His mother corroborated that testimony.

Under the specific policy provisions involved here the insurer agreed to pay: "* * * in event of the death of each insured which shall result directly and independently of all other causes from bodily injury caused by accident and sustained by the insured while occupying or through being struck by an automobile, provided the death shall occur: (1) within ninety days from the date of such accident, * * * Bodily Injury—means bodily injury, sickness or disease including death at any time resulting therefrom. Insuring Agreement IV (which includes the above provisions) does not apply: * * * (b) to bodily injury or to loss caused by or resulting from disease except pus forming infection which shall occur through bodily injury to which this insurance applies; * * *." (Insert in parentheses is ours.) It is substantially conceded that the insured did suffer some bodily injury on January 29, 1960, while occupying his automobile, thus beginning the train of events. The issue is whether that injury, under the terms of the policy and our cases, operated as the requisite cause of his death. It should be noted that there was *no* medical or other expert testimony.

The plaintiff (appellant) presents these points: (1) that the Court erred in not sustaining its motion for a directed verdict and in failing to sustain its after-trial motion for judgment because: the evidence failed to show that the death resulted directly and independently of all other causes from bodily injury, and that this question was left in the realm of conjecture, without substantial evidence; the burden resting upon defendant required her to establish that cause of death by credible medical testimony and with "reasonable medical certainty"; the policy provisions are clear and unambiguous, and the courts may not rewrite them under the guise of construction. Defendant, answering, submits: that the death certificate made a prima facie case for her, establishing that the back injury was the "direct, proximate, efficient and producing cause" of the death; that the hospital records speak as though the physicians making them were present and had testified, hearsay being thus obviated; that necessary medical or surgical treatment for a bodily injury and resulting in death, is not an intervening cause breaking the causal connection, but constitutes a death from bodily injury within the meaning of the policy; that insurer, having offered no evidence to rebut defendant's prima facie case, cannot escape liability by building "inference upon inference," as to the related (and stated) causes of the death.

We may start with the proposition that the beneficiary of a policy of accident insurance always has the burden of proving a cause of death which is within the insuring provisions. Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W.2d 907, 39 A.L.R. 56; Phillips v. Travelers' Ins. Co. of Hartford, Conn., 288 Mo. 175, 231 S.W. 947; Gennari v. Prudential Ins. Co. of America, Mo., 335 S.W.2d 55; Boring v.

Kansas City Life Ins. Co., Mo., 274 S.W.2d 233. This burden remains upon the beneficiary throughout the case (Boring, supra; Felker v. Metropolitan Life Ins. Co., Mo. App., 288 S.W.2d 26), although upon the establishing of a prima facie case the insurer may be required to go forward with evidence. Defendant insists here that she made a prima facie case and, since plaintiff produced no evidence, her case was sufficient to sustain the verdict. She cites the statute, § 193.170, RSMo 1959, V.A.M.S., to the effect that a death certificate is prima facie evidence of the facts stated therein, and also, Felker v. Metropolitan Life Ins. Co., Mo.App., 288 S.W.2d 26; Boring v. Kansas City Life Ins. Co., Mo., 274 S.W.2d 233. The principle is recognized; some of its limitations are stated in Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 207 S.W.2d 279. The difficulty here lies in the inconsistencies and insufficiencies inherent in this particular certificate. The *causes* stated were (a) myocardial failure, (b) cerebral anoxia, and (c) cardiac arrest. When these are considered, along with the printed instructions, they clearly mean that the *"underlying cause"* was the cardiac arrest or heart stoppage, which led to the other complications stated in the certificate, and presumably to all, or nearly all, of those stated in the autopsy report. Cerebral anoxia simply means a lack of oxygen in the brain. Thus, the heart arrest and impaired heart action (then and thereafter) resulted in a decreased and insufficient supply of oxygen to the brain and lungs with resultant congestion, sundry complications, and ultimate death. Defendant seeks her principal support from Part 11 of the certificate, namely: "Part 11. Other significant conditions contributing to death but not related to the terminal disease condition given in Part 1(a)  Pt was being operated upon for back condition originating from auto accident—occurring—1-29-60." So far as this case is concerned, the first (and printed) phrase, ending with "Part 1(a)," is inconsistent within itself, and so much so as to make it, and the following notations, mean-

ingless without adequate medical explanation. One may not pick out the element of *"contributing"* and disregard the words *"not related to."* In this situation we hold that the notations concerning the operation do not, in and of themselves, show that either the operation or the automobile injury was the cause of death. And even if we disregarded the inconsistency, defendant's burden of proof would not be satisfied merely by a showing that the injury *contributed* to the death. Thus, the death certificate did not, in itself, make out a submissible case.

There can be little question here that the underlying cause of the death was the cardiac arrest. The pervading issue and question is,—*what* caused the cardiac arrest? True, it occurred during the operation, but no layman can state authoritatively that the operation or the anesthetic caused the arrest or, on the other hand, that the operation was merely coincidental. The jury was left to speculate. See, generally: Franklin v. Kansas City Public Service Co., 239 Mo. App. 151, 186 S.W.2d 546; Hutchison v. Aetna Life Ins. Co., 182 Or. 639, 189 P.2d 586; Vargo v. New York Life Ins. Co. (DC Md.), 180 F.Supp. 638. And lay testimony of prior apparent good health does not supply this deficiency. Frank v. Atlanta Life Ins. Co., Mo.App., 211 S.W.2d 940; Aetna Life Ins. Co. v. Kelley (CA 8), 70 F.2d 589; New York Life Ins. Co. v. Feinberg, Mo., 229 S.W.2d 531, 537; Hendricks v. National Life & Acc. Ins. Co., 240 Mo.App. 557, 210 S.W.2d 706; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644. We hold that expert, medical evidence was necessary here to show the cause of the cardiac arrest. Defendant's counsel insist, as already indicated, that the hospital records fill in this gap. We do not so interpret them. Assuming the propriety of the argument that the records speak with the same authority as would the doctors if they were on the stand, it is still true that *nowhere* do the records state the cause of the cardiac arrest. They do state its occurrence during the operation, the restorative measures used, and the various findings upon autopsy and other-

wise, all leading back to the bare occurrence of the cardiac arrest.

Ordinarily such an injury as the insured suffered in this minor automobile accident would not result in death, even though a herniated disc ensued. There is authority, however, to the effect that proper and necessary medical or surgical treatment (including anesthetics) for an accidental injury does not break the chain of causation between the accidental means of the injury and the death, where the death is caused by the treatment or operation. 29A Am.Jur., Insurance, §§ 1219, 1220, pp. 361–362; Ballam v. Metropolitan Life Ins. Co., 295 Mass. 411, 3 N.E.2d 1012, 108 A.L.R. 1; Collins v. Casualty Co. of America, 224 Mass. 327, 112 N.E. 634, L.R.A.1916E, 1203; Gardner v. United Surety Co., 110 Minn. 291, 125 N.W. 264, 26 L.R.A.,N.S., 1004; Travelers' Ins. Co. v. Murray, 16 Colo. 296, 26 P. 774, 25 Am.St.Rep. 267. Indeed, plaintiff seems to concede this principle, stating in its brief: "Surgery to correct and alleviate injury does not break the causal connection between the injury and death but to support recovery there must be that causal connection established between the injury and death." The cases which we have cited are not recent cases, and we find no such, but the principle is analogous to that which permits a recovery as for death by accidental means where the immediate cause of death is a disease which has, in turn, been directly caused by an accidental injury. See Mutual Benefit Health & Accident Ass'n v. Francis (CA 8), 148 F.2d 590; Aetna Life v. Kelley (CA 8), 70 F.2d 589; Bellows v. Travelers' Ins. Co., Mo., 203 S.W. 978; Anderson v. Mutual Benefit Health & Accident Ass'n, Mo.App., 231 S.W. 75. It should be noted, however, that in such cases medical testimony has very generally (if not always) been produced to establish the causation.

■ We do not consider the principles just discussed as in anywise in conflict with the case of Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W.2d 907, 39 A.L.R. 56, which has long been the Missouri law and which we now re-affirm. There it was held that a death from thrombosis and an intestinal obstruction, occurring as the *result* of an operation voluntarily sought and skillfully performed, was not a death resulting solely from accidental *means,* even though the result may have been unexpected and unforeseen. We are discussing now operations or treatment fairly shown by medical testimony to have been necessitated by an injury which was directly caused by accidental means. And we are not, hereby, abolishing the distinction between "accidental means" on the one hand, and an accidental result or a mere "accident," on the other.

■ The present judgment might be reversed without remand. We have held, however, that where it appears that the evidence has not been fully developed, it is permissible to remand the case. We shall do so here, in order that defendant may develop by expert medical testimony, if so advised and if such testimony is available: (1) the medical necessity for the operation in question as the regular and proper treatment, and (2) the cause of the cardiac arrest, with its ensuing complications.

While no question is raised on this appeal concerning instructions, the parties might be well advised to consider the case of Gennari v. Prudential Ins. Co. of America, Mo., 335 S.W.2d 55, upon another trial. That case may be particularly applicable if the evidence develops either a pre-existing causative disease, or some bodily infirmity or weakness. If a causative effect from the operation itself is developed, that element should be considered in the instructions. Plaintiff's Instruction No. 6 omits all reference to the cause of the cardiac arrest, and defendant's Instruction No. 2 omits all reference to the operation itself, a basic fact in the chain of circumstances.

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.

All concur.